******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ERIKA TORRES *v.* ALEXANDER
A. CARRESE ET AL.
(AC 34350)

Beach, Bear and Peters, Js.

*Argued October 18, 2013—officially released April 22, 2014*

(Appeal from Superior Court, judicial district of Fairfield, Jones, J. [motions to dismiss]; Levin, J. [motions to dismiss; summary judgment motions, judgment].)

*Jonathan Perkins*, with whom were *Wendi Kowarik* and, on the brief, *Karen L. Dowd* and *Brendon P. Levesque*, for the appellant-cross appellee (plaintiff).

*James F. Biondo*, with whom, on the brief, was *Audrey D. Medd*, for the appellee-cross appellant (named defendant).

*David J. Robertson*, with whom, on the brief, were *Madonna A. Sacco* and *Jeremy P. Chen*, for the appellee-cross appellant (defendant Abraham J. Yaari).

*Opinion*

BEACH, J. This appeal arises from a medical malpractice action brought by the plaintiff, Erika Torres, against the defendants, Alexander A. Carrese and Abraham J. Yaari, board certified obstetrician-gynecologists. The plaintiff claims: (1) the trial court erred in dismissing her professional negligence claims against both defendants on the ground that the written opinion letter that she attached to her complaint did not satisfy the requirements of General Statutes § 52-190a; and (2) the trial court erred in granting the defendants' motions for summary judgment as to her claims against both defendants alleging lack of informed consent. We affirm the judgment of the trial court.

The following facts, which were undisputed for the purpose of summary judgment, and procedural history are relevant to our disposition of the plaintiff's claims. Carrese was the plaintiff's obstetrician-gynecologist from the time the plaintiff was sixteen years old. Carrese successfully performed two cesarean sections on the plaintiff for her two prior pregnancies. In 2004, the plaintiff became pregnant with her third child. The plaintiff was scheduled to deliver her third child in September, 2004. During her 2004 pregnancy, Carrese and the plaintiff understood that her third child would be delivered by cesarean section. In the fourth or fifth month of her pregnancy, the plaintiff began to experience pain, bleeding, and cramping. Carrese diagnosed the plaintiff to have the condition of placenta previa.[1] Carrese described the condition as "placenta before baby" and explained to the plaintiff that the placenta was blocking the path out of the womb.

On May 28, 2004, the plaintiff presented at Bridgeport Hospital with signs of vaginal bleeding and was seen by Yaari for the first time. While the plaintiff was dressed and sitting in bed, she informed a nurse that she wanted to leave. The plaintiff signed herself out of the hospital against medical advice.

In August, 2004, prior to leaving Connecticut for a vacation, Carrese arranged for Yaari to cover his patients. On August 5, 2004, while Carrese was on vacation, the plaintiff went into labor. The plaintiff presented at St. Vincent's Medical Center in Bridgeport, thirty-five weeks pregnant with vaginal bleeding and uterine contractions. The plaintiff was seen by Yaari. Sometime after the plaintiff was admitted, Yaari diagnosed the plaintiff to have the condition of placenta previa. Yaari delivered the plaintiff's third child by cesarean section.

As the court related, "After performing the cesarean section, Yaari discovered that the plaintiff in fact had placenta percreta and that the placenta had invaded the wall of the bladder causing substantial bleeding, [and] requiring a hysterectomy. The contemporaneous hospital record signed by Yaari further state[d] that

the plaintiff 'was taken to the operating room and a cesarean section was performed. A live baby girl was delivered. . . . Because of the severe bleeding that we could not prevent even though the incision on the uterus was in the fundal area, we had to pursue a . . . hysterectomy. Because of the location of the placenta at the lower level of the uterus, it penetrated the posterior wall of the bladder and thus was removed with the uterus and we called for intraoperative urology evaluation. The urology team arrived . . . and the patient had later on a reconstruction of the bladder' . . . ."

In September, 2006, the plaintiff served this medical malpractice action on the defendants, Carrese and Yaari.[2] The complaint alleged that each defendant was "a duly licensed physician engaged in the practice of medicine in the State of Connecticut and a specialist in the field of obstetrics and/or gynecology."[3] The complaint alleged that the defendants were negligent in their obstetric care of the plaintiff. Specifically, count one alleged that Carrese, who had been the plaintiff's obstetrician since she was sixteen and had provided her with prenatal care for several months prior to August 5, 2004, was negligent in providing prenatal care to the plaintiff because he (1) "failed to maintain adequate medical records pertaining to the plaintiff's condition of placenta previa," (2) failed to detect the plaintiff's condition of placenta previa and/or placenta accreta, (3) "failed to convey to other treating doctors the fact that the plaintiff suffered from [placenta previa and/or placenta accreta]," (4) "failed to undertake necessary diagnostic testing such as ultrasounds," (5) "failed to advise the plaintiff of the risk that her bladder would be injured during the cesarean section and/or related procedures," and (6) failed to recognize that the plaintiff's condition required the intervention of a urologist and, in failing-refusing to procure the services of a urologist during the prenatal period, undertook to provide medical services which were within the specialty of a urologist. The plaintiff claimed that as a result of Carrese's negligent conduct she sustained damage to her bladder and uterus that has rendered her permanently incontinent, caused her pain and suffering, and prevented her from obtaining gainful employment, and incurred medical expenses.

Count two alleged that Yaari, the obstetrician who performed the plaintiff's cesarean section, was negligent in his obstetric care of the plaintiff because he (1) "failed to take the proper precautions during the plaintiff's cesarean section and/or related procedures as to avoid injuring her bladder (including arranging for the delivery to occur in the appropriate facility and arranging for a urologist to deal with the potential placenta accreta condition)," (2) "failed to undertake the appropriate investigations to determine whether the plaintiff suffered from placenta previa and/or placenta accreta," (3) "caused injury to the plaintiff's bladder,"

and (4) "undertook to perform medical services which were within the specialty of a urologist." Count two also alleged that Yaari "failed to advise the plaintiff of the risk that her bladder would be injured during the cesarean section and/or related procedures . . . ." The plaintiff claimed that as a result of Yaari's negligent conduct, she was "forced to undergo a hysterectomy and can no longer bear children," her "bladder is damaged and she is incontinent," she has "undergone anguish, pain and suffering" and incurred medical expenses, she has been unable to obtain gainful employment and to participate in many of life's activities, and she will "in the future undergo further debilitating and painful treatments and undergo further anguish, pain and suffering and medical expenses."

With her complaint, the plaintiff filed a good faith certificate signed by her attorney, who represented therein that he had made a reasonable inquiry into the circumstances of the plaintiff's claims and that, on the basis of that inquiry, he believed in good faith that the defendants had been negligent in their treatment of the plaintiff. Additionally, pursuant to § 52-190a (a), the plaintiff submitted a written opinion letter of a medical expert, dated September 5, 2006, who had reviewed the defendants' care of the plaintiff and rendered his opinion as to that care as well as to the care of the plaintiff's treating urologists.[4] Jay Motola, a board certified urologist, concluded that the plaintiff's urologists had provided her good care. With respect to the defendants, Motola opined in relevant part: "On the other hand, the obstetricians involved in the care of this case need to be further scrutinized. Clearly the root cause of the subsequent urinary fistula does not lie with the urologic care that was provided, but rather the original injury to the urinary tract that the obstetricians created. It is my opinion to a reasonable degree of medical certainty, that the obstetricians, Drs. Carrese and Yaar[i] breached the standard of care due to the [plaintiff] by causing the original injury to her urinary tract. It is this injury that has rendered the [plaintiff] in the state that she is presently in and therefore the liability lies on the part of the treating obstetricians. . . . It is also my opinion that . . . Carrese breached the prevailing standard of care by failing to maintain adequate medical records [while] taking care of [the plaintiff]."

On November 13, 2006, Yaari filed a motion to dismiss the plaintiff's complaint on the ground that the written opinion letter submitted by the plaintiff was not written by a "similar health care provider," as defined by General Statutes § 52-184c and as mandated by § 52-190a, and therefore, dismissal was proper pursuant to § 52-190a (c).[5] On November 15, 2006, counsel for Carrese filed a motion to dismiss on similar grounds.[6] According to the court, "Oral argument was heard on January 2, 2007, at which time the court, *Jones, J.*, granted Yaari's motion because it was unopposed . . . [and] Carrese's

motion was marked off because the plaintiff's counsel was absent. On the same day, the plaintiff filed an objection to . . . Yaari's motion. The plaintiff then, on January 3, 2007, filed a motion to set aside the dismissal as to . . . Yaari and for reargument, which was granted by the court, *Jones, J.*, on January 22, 2006. On February 26, 2007 . . . Carrese filed another motion to dismiss . . . which was in all respects identical to his prior motion . . . .

"Oral argument was heard a second time on February 26, 2007. . . . The defendants move[d] to dismiss the [plaintiff's] first amended complaint on the ground that the first written opinion [letter] submitted by the plaintiff was not obtained from a 'similar health care provider' as mandated by § 52-190a. They argue[d] that the plain language of § 52-190a (c) indicate[d] that [failure to attach a sufficient written opinion letter was] ground for dismissal of the action. They also contend[ed] that the failure to attach an adequate medical opinion [was] not a curable defect, and, therefore, the plaintiff's amended complaint, attaching the opinion of an [obstetrician-gynecologist was] not properly before the court. Furthermore, even if the amendment [was] effective, the defendants argue[d] that the second opinion provided [was] sparse and [was] insufficient to meet the statutory requirement that the opinion 'include a detailed basis for the formation of such opinion.' " (Citations omitted; footnotes omitted.) On April 4, 2007, the court, *Jones, J.*, denied the defendants' motions to dismiss on the ground that an insufficient opinion letter, as opposed to the absence of an opinion letter, was not a sufficient ground for dismissal.[7]

On January 19, 2011, the case was called for trial. On January 31, 2011, and February 10, 2011, after our Supreme Court released its opinion in *Bennett* v. *New Milford Hospital, Inc.*, 300 Conn. 1, 21, 12 A.3d 865 (2011) (holding in cases against specialists, author of written opinion letter pursuant to § 52-190a [a] must be "similar health care provider" as defined in § 52-184c [c], regardless of author's potential qualifications to testify at trial, and insufficient written opinion letter, while not impairing subject matter jurisdiction, requires dismissal of action under § 52-190a [c]), the defendants each filed new motions to dismiss the plaintiff's complaint.[8] On March 7, 2011, the court granted the defendants' motions to dismiss the plaintiff's complaint because the plaintiff failed to attach an opinion letter from a similar health care provider to the complaint as required by § 52-190a.[9] The court subsequently reconsidered and vacated its decision only as to the plaintiff's purported claims of lack of informed consent, combined within allegations of negligence, reasoning that the requirements of a good faith certificate and a written opinion letter from a similar health care provider do not apply to a claim of lack of informed consent.

On July 28, 2011, Carrese moved for summary judgment as to the plaintiff's claims of lack of informed consent on the ground that the plaintiff did not plead lack of informed consent, and, alternatively, to the extent that a lack of informed consent claim was pleaded, no triable issue existed. On August 1, 2011, Yaari also moved for summary judgment. The plaintiff filed separate objections to the defendants' motions on September 23, 2011. On December 30, 2011, the court granted the defendants' motions for summary judgment as to the plaintiff's alleged claims of lack of informed consent, and, on January 3, 2012, issued a supporting memorandum of decision.[10] This appeal and the defendants' cross appeal followed. See footnote 22 of this opinion. Additional facts will be set forth as necessary.

I

On appeal, the plaintiff first claims that the court improperly dismissed her professional negligence claims because the written opinion letter, authored by a urologist, not an obstetrician-gynecologist, was sufficient to meet the requirements of §§ 52-190a (a) and 52-184c. The plaintiff argues alternatively that even if the original opinion letter was insufficient, § 52-190a does not implicate subject matter jurisdiction, and therefore, because the defendants' motions to dismiss were filed outside the time period set forth by Practice Book (2006) § 10-30, the court erred in considering and granting their motions to dismiss.[11] We address these arguments separately.

A

The plaintiff first claims that the court improperly dismissed her professional negligence claims because the opinion letter, authored by a urologist rather than an obstetrician-gynecologist, was sufficient to meet the requirements of §§ 52-190a (a) and 52-184c. The defendants argue that because they are board certified obstetrician-gynecologists only another board certified obstetrician-gynecologist qualifies as a "similar health care provider" as defined by §§ 52-190a and 52-184c and *Bennett* v. *New Milford Hospital, Inc.*, supra, 300 Conn. 1. We agree with the defendants.

Our review of a trial court's ruling on a motion to dismiss pursuant to § 52-190a is plenary. See *Morgan* v. *Hartford Hospital*, 301 Conn. 388, 395, 21 A.3d 451 (2011) ("[t]he interpretation of § 52-190a is a question of law over which this court exercises plenary review").

We begin our analysis by setting forth the relevant statutory provisions. Section 52-190a (a) provides that before filing a personal injury action against a health care provider, the attorney or party filing the action must make "a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. . . ."[12] To show

a good faith belief, the complaint must be accompanied by a written and signed opinion of a "similar health care provider," as defined in § 52-184c, stating that there appears to be evidence of medical negligence and including a detailed basis for the formation of that opinion. General Statutes § 52-190a. To determine if an opinion letter meets the requirements of § 52-190a (a), the letter must be read in conjunction with § 52-184c (c), which defines the term "similar health care provider." *Wilkins* v. *Connecticut Childbirth & Women's Center*, 135 Conn. App. 679, 686, 42 A.3d 521, cert. granted on other grounds, 305 Conn. 921, 47 A.3d 881 (2012). For health care providers who are board certified or who hold themselves out as specialists, such as the obstetrician-gynecologists who treated the plaintiff in this case, § 52-184c (c) defines "similar health care provider" as one who: (1) "[i]s trained and experienced in the same specialty"; and (2) "is certified by the appropriate American board in the same specialty . . . ."[13]

The plaintiff argues that the opinion letter, authored by a urologist, is sufficient to meet the requirements of § 52-190a because this case falls within the statutory exception to the requirement that only board certified cognates of the defendant physician may author the written opinion required by § 52-190a. In defining "similar health care provider," § 52-184c (c) provides that where "the defendant health care provider is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a 'similar health care provider'." The plaintiff further argues that this case falls within the statutory exception because her complaint alleged that "the defendants had left the area of obstetrics and were diagnosing and treating the plaintiff's urological system, something outside their specialty."

This argument fails for two reasons. First, in the written opinion letter dated September 5, 2006, Motola, the board certified urologist, never suggested that the defendants were diagnosing or treating the plaintiff for a condition not within their specialty. Second, the plaintiff's bladder and ureter were damaged when Yaari was performing a hysterectomy, an obstetric-gynecological procedure, because of the plaintiff's condition of placenta percreta, an obstetric condition. Because this case does not fall within the statutory exception, the original written opinion letter submitted by the plaintiff must satisfy the requirements of §§ 52-190a and 52-184c (c) in order to be effective.

In this regard, the plaintiff's claim is governed by *Bennett* v. *New Milford Hospital, Inc.*, supra, 300 Conn. 1. In *Bennett*, our Supreme Court concluded that "in cases of specialists, the author of an opinion letter pursuant to § 52-190a (a) must be a similar health care provider as that term is defined by § 52-184c (c), regard-

less of his or her potential qualifications to testify at trial pursuant to § 52-184c (d)." Id., 21. Put another way, "one's familiarity with or knowledge of the relevant standard of care, for purposes of authoring a prelitigation opinion letter, is not a proper consideration in determining the adequacy of that letter if the author does not meet the statutory definition of a 'similar health care provider.' " *Wilkins* v. *Connecticut Childbirth & Women's Center*, supra, 135 Conn. App. 687. In *Bennett*, the court held that, because the plaintiff alleged in his complaint that the defendant was a specialist in emergency medicine, the court was correct in concluding that the opinion letter authored by a general surgeon, with added qualifications in surgical critical care, who engaged in the practice of trauma surgery, was not authored by a similar health care provider as defined by § 52-184c (c) and therefore did not satisfy § 52-190a. *Bennett* v. *New Milford Hospital, Inc.*, supra, 24. Therefore, pursuant to *Bennett*, the language of §§ 52-190a (a) and 52-184c (c) dictates that a "similar health care provider" with respect to the plaintiff's health care providers in this case is one who is trained and experienced in obstetrics-gynecology and is board certified in obstetrics-gynecology. Because the author of the opinion letter submitted by the plaintiff is neither, the letter does not comply with § 52-190a (a), and accordingly, the court properly dismissed the plaintiff's professional negligence claims.[14] See *Bennett* v. *New Milford Hospital, Inc.*, supra, 28 ("dismissal is the mandatory remedy when a plaintiff fails to file an opinion letter that complies with § 52-190a [a]"); see also *Morgan* v. *Hartford Hospital*, supra, 301 Conn. 398 ("the legislature envisioned the dismissal as being without prejudice . . . and even if the statute of limitations has run, relief may well be available under the accidental failure of suit statute" [internal quotation marks omitted]).

B

The plaintiff also claims that, even if the original opinion letter was insufficient, § 52-190a does not implicate subject matter jurisdiction, and therefore, because the defendants' motions to dismiss were filed outside the time period set forth by Practice Book (2006) § 10-30,[15] the court erred in considering, and granting, the motions to dismiss. The defendants argue that the court properly determined that their 2011 motions to dismiss were functionally motions to reargue their timely filed 2006 motions to dismiss the plaintiff's complaint. In the unusual circumstances of this case, we agree with the defendants.

The following additional facts are relevant. At the hearing on the defendants' 2011 motions to dismiss,[16] the plaintiff argued that the defendants' motions to dismiss were, in essence, motions to reargue their 2006 motions to dismiss[17] that did not comply with the man-

datory time requirements set forth in Practice Book § 11-12. The plaintiff further argued that no statute or rule of practice authorized filing a motion to dismiss, not claiming lack of subject matter jurisdiction, five and one-half years after filing an appearance.[18] In its memorandum of decision, the court agreed with the plaintiff that the 2011 motions to dismiss were really motions to reargue the 2006 motions to dismiss.[19] The court also agreed that the defendants' motions were untimely because § 11-12 mandates that motions to reargue be filed within twenty days of the decision. The court concluded, however, that it properly could entertain the defendants' 2011 motions to dismiss because the defendants' failure to meet the timeliness requirements did not deprive the court of jurisdiction, and it otherwise was within the court's discretion to entertain the motions.

1

We first consider whether the trial court properly concluded that the defendants' 2011 motions to dismiss were functionally motions to reargue their 2006 motions to dismiss. "[T]he interpretation of pleadings is always a question of law for the court and . . . our interpretation of the pleadings therefore is plenary." (Internal quotation marks omitted.) *Dimmock* v. *Lawrence & Memorial Hospital, Inc.*, 286 Conn. 789, 799–800, 945 A.2d 955 (2008); see also *Sherman* v. *Ronco*, 294 Conn. 548, 554 n.10, 985 A.2d 1042 (2010). "[P]leadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 253, 990 A.2d 206 (2010). Courts analyze pleadings for what they are, rather than for what their titles state they are. See, e.g., *State* v. *Smith*, 19 Conn. App. 646, 648, 563 A.2d 1034 ("[a party] cannot change the nature of his motion by changing its title any more than one can make a bull a cow by giving it a female name"), cert. denied, 213 Conn. 806, 567 A.2d 836 (1989).

In this case, the defendants' original 2006 motions to dismiss sought to dismiss the plaintiff's complaint on the ground that the plaintiff's failure to attach a written opinion letter from a similar health care provider, as mandated by § 52-190a, deprived the court of jurisdiction. The defendants' 2011 motions to dismiss sought to dismiss the plaintiff's complaint on the ground that the plaintiff's failure to attach a written opinion letter from a similar health care provider required dismissal of the action pursuant to § 52-190a (c) and *Bennett* v. *New Milford Hospital, Inc.*, supra, 300 Conn. 1. The defendants' 2011 motions to dismiss essentially sought to reverse or to modify the denials of their earlier 2006 motions to dismiss[20] by Judge Jones. We conclude that the court was correct in concluding that the defendants' 2011 motions to dismiss, despite their titles, were in

reality motions to reargue their 2006 motions to dismiss.

2

The plaintiff contends that the twenty day filing deadline in Practice Book § 11-12 (a) is a mandatory limitation, and therefore, because the defendants' 2011 motions were untimely, Judge Levin improperly considered the motions.[21] The defendants argue that Judge Levin properly considered their 2011 motions to dismiss.[22] We agree with the defendants.

We review the plaintiff's claim under the abuse of discretion standard; see, e.g., *Chartouni* v. *DeJesus*, 107 Conn. App. 127, 127, 129, 944 A.2d 393 (we review denial of motion to reargue for abuse of discretion), cert. denied, 288 Conn. 902, 952 A.2d 809 (2008); and conclude that the court did not abuse its discretion in considering the defendants' untimely 2011 functional motions to reargue.

Practice Book § 11-12 (a) provides: "A party who wishes to reargue a decision or order rendered by the court *shall*, within twenty days from the issuance of notice of the rendition of the decision or order, file a motion to reargue setting forth the decision or order which is the subject of the motion, the name of the judge who rendered it, and the specific grounds for reargument upon which the party relies." (Emphasis added.) "We construe words used in the Practice Book according to their commonly approved meaning." *Lo Sacco* v. *Young*, 210 Conn. 503, 507, 555 A.2d 986 (1989). The word "shall" typically implies a mandatory connotation. "Our Supreme Court previously has recognized the significance of the [drafter's] choice in electing to choose shall or may in formulating a . . . directive. . . . Absent an indication to the contrary, the [drafter's] choice of the mandatory term shall rather than the permissive term may indicates that the . . . directive is mandatory." (Citation omitted; internal quotation marks omitted.) *Vargas* v. *Doe*, 96 Conn. App. 399, 412, 900 A.2d 525, cert. denied, 280 Conn. 923, 908 A.2d 546 (2006). Ordinarily, then, a motion to reconsider must be timely filed, and a court may and usually should decline to consider an untimely motion.

Our determination that the filing deadline in Practice Book § 11-12 is mandatory, however, does not end the inquiry. "Rules of practice are not statutory or constitutional mandates, but they reflect the courts' authority to prescribe rules to regulate their proceedings and facilitate the administration of justice . . . . Even if a . . . Practice Book rule must be strictly construed and is mandatory, compliance with its requirements does not necessarily become a prerequisite to a court's subject matter jurisdiction." (Citations omitted; internal quotation marks omitted.) *State* v. *Falcon*, 84 Conn. App. 429, 433, 853 A.2d 607 (2004), overruled in part on other grounds by *State* v. *Das*, 291 Conn. 356, 368,

968 A.2d 367 (2009); see also *Lo Sacco* v. *Young*, supra, 210 Conn. 508 (failure to comply with mandatory time requirement in our rules of practice does not affect subject matter jurisdiction); Practice Book § 1-8 ("[t]he design of these rules being to facilitate business and advance justice, they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice"). For example, our Supreme Court has held that a failure to meet the twenty day deadline to appeal from a final judgment, as required by our rules of practice, does not deprive an appellate court of jurisdiction, even where the opposing party files a motion to dismiss the untimely appeal. See *Kelley* v. *Bonney*, 221 Conn. 549, 559, 606 A.2d 693 (1992) ("pursuant to Practice Book § 4056 [now § 66-8], the Appellate Court had broad discretion to hear the appeal, whether timely filed or not"). The issue, then, is whether the court abused its discretion in granting the defendants' motions to reargue, which were untimely according to the terms of our rules of practice.

After a thorough review of the record, we conclude that the court did not abuse its discretion in considering the defendants' untimely 2011 motions to dismiss. First, as noted previously, noncompliance with mandatory filing deadlines in our rules of practice does not deprive the court of subject matter jurisdiction to consider the pleading. Second, the defendants, in filing their 2011 motions to dismiss, sought reconsideration because of a newly articulated controlling principle of law set forth by our Supreme Court in *Bennett* v. *New Milford Hospital, Inc.*, supra, 300 Conn. 1. See *Opoku* v. *Grant*, 63 Conn. App. 686, 692–93, 778 A.2d 981 (2001) ("[T]he purpose of a reargument is . . . to demonstrate to the court that there is some decision or some principle of law which would have a controlling effect, and which has been overlooked, or that there has been a misapprehension of facts. . . . [A] motion to reargue . . . is not to be used as an opportunity to have a second bite of the apple or to present additional cases or briefs which could have been presented at the time of the original argument." [Citations omitted; internal quotation marks omitted.]). Thus, it was reasonable for the defendants to file what amounts to a late motion to reargue before a second judge in light of the Supreme Court's decision in *Bennett*, issued almost four years after Judge Jones issued his ruling on the defendants' 2006 motions to dismiss.[23]

For the aforementioned reasons we conclude that the court properly considered and granted the defendants' 2011 motions to dismiss.

## II

The plaintiff also claims that the court erred in rendering summary judgment as to her claims of lack of informed consent against Carrese and Yaari. Specifically, the plaintiff argues that the court (1) erred in

concluding that Carrese had no duty to obtain the plaintiff's informed consent, and (2) erred in concluding that Yaari had no obligation to disclose to the plaintiff that the cesarean hysterectomy[24] could perhaps be more safely performed at another health care facility. We address these claims separately.

"Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law.[25] . . . Our review of the trial court's decision to grant [the defendant's] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Milton* v. *Robinson*, 131 Conn. App. 760, 779, 27 A.3d 480 (2011), cert. denied, 304 Conn. 906, 39 A.3d 1118 (2012).

"[T]he lack of informed consent claim is a different cause of action from [a] claim of [medical] negligence . . . ."[26] *Goral* v. *Kenney*, 26 Conn. App. 231, 237 n.7, 600 A.2d 1031 (1991). "In order to prevail on a cause of action for lack of informed consent, a plaintiff must prove *both* [1] that there was a failure to disclose a known material risk of a proposed procedure and [2] that such failure was a proximate cause of his injury."[27] (Emphasis added.) *Shortell* v. *Cavanagh*, 300 Conn. 383, 388, 15 A.3d 1042 (2011). In order to obtain valid informed consent, the physician's disclosure to the patient must include four factors: (1) the nature of the *procedure*; (2) the risks and hazards of the *procedure*; (3) the alternatives to the *procedure*; and (4) the anticipated benefits of the *procedure*. *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 292, 465 A.2d 294 (1983).

Our Supreme Court has adopted an objective lay standard for determining the materiality of risk. See, e.g., *Shortell* v. *Cavanagh*, supra, 300 Conn. 388 ("[u]nlike a medical malpractice claim, a claim for lack of informed consent is determined by a lay standard of materiality, rather than an expert medical standard of care which guides the trier of fact in its determination"); see also *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 292 (adopting lay standard for lack of informed consent claims). "[T]he lay standard of informed consent requires a physician to provide the patient with that information which a *reasonable* patient would have found material for making a decision whether to embark upon a contemplated course of therapy." (Emphasis in original; internal quotation marks omitted.) *Duffy* v. *Flagg*, 279 Conn. 682, 692, 905 A.2d 15 (2006). "Materiality may be said to be the significance a reasonable

person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment." (Internal quotation marks omitted.) *Logan* v. *Greenwich Hospital Assn.*, supra, 291. Our Supreme Court has also noted, however, "that the cases on informed consent require something less than a full disclosure of all information which may have some bearing, however remote, upon the patient's decision." (Internal quotation marks omitted.) *Duffy* v. *Flagg*, supra, 692.

A

The plaintiff claims that the court erred in concluding that Carrese had no duty to obtain the plaintiff's informed consent. The plaintiff argues, essentially, that, because Carrese was providing her prenatal care and anticipated that he would be the physician to perform the eventual cesarean section, he had an obligation to provide the plaintiff, and any subsequent substitute treating physician, with information about the plaintiff's condition and the nature of her pregnancy "such that she could make knowing consent to treatment."[28] We disagree.

The following additional facts and procedural history are relevant. In count one of her April 21, 2011 revised complaint, the plaintiff alleged that Carrese (1) "failed to advise the plaintiff in timely fashion of her options with respect to complete bed rest, early delivery or other means of dealing with potentially life threatening complication of placenta percreta in a timely and appropriate fashion"; (2) "failed to advise the plaintiff of the possibility of complications during delivery due to her condition(s) of placenta previa, placenta accreta and/or placenta percreta"; and (3) "failed to advise the plaintiff of the risk that her bladder would be injured during the cesarean [hysterectomy] . . . ."

On July 28, 2011, Carrese moved for summary judgment on the grounds that the plaintiff did not allege lack of informed consent[29] or alternatively, to the extent that a lack of informed consent claim was pleaded, no genuine issue of fact existed. In support of his motion, Carrese submitted his affidavit. In its January 3, 2012 memorandum of decision, the court granted the motion and explained its decision: "The plaintiff does not dispute that Carrese neither performed nor participated in the plaintiff's cesarean hysterectomy. Therefore, Carrese had no duty to obtain the plaintiff's informed consent. Carrese's motion for summary judgment is granted."

The plaintiff argues that because Carrese provided her prenatal care and anticipated that he would be the physician to perform the eventual cesarean section, he had an obligation to provide the plaintiff, with information about the plaintiff's condition and the nature of

her pregnancy "such that she could make knowing consent to treatment." The plaintiff also argues that Carrese had an obligation to provide any subsequent substitute treating physician with information about her condition such that she could give informed consent to treatment. We disagree.

Our case law regarding the issue of a physician's obligation to obtain a patient's informed consent focuses on the decision "to embark upon a contemplated course of therapy," such as a "procedure," "operation," or "surgery." (Internal quotation marks omitted.) *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 290–94 (examining our informed consent case law). Carrese provided the plaintiff prenatal care. It is undisputed that Carrese did not perform the plaintiff's cesarean section and was on vacation with his family at the time of the plaintiff's surgery. Although he may have anticipated performing a cesarean section sometime in the future, the operation was not imminent and there was no immediate reason for specific informed consent. Unlike performing a cesarean section, providing prenatal care is *not* a "procedure," "operation," or "surgery."

Under the current state of the law of informed consent, Carrese did not have an obligation to provide the plaintiff, or any subsequent substitute treating physician, with information regarding the increased risks the plaintiff might face when undergoing a cesarean section due to her condition of placenta previa.[30]

The plaintiff makes much of the fact that Carrese *intended* at some point to perform the cesarean section. Under our law, however, a physician's obligation to obtain informed consent turns on the performance of a procedure and *not* the intent to perform a procedure. Consequently, we find that the plaintiff's arguments are unavailing. See, e.g., *Sherwood* v. *Danbury Hospital*, 278 Conn. 163, 171 n.8, 192, 194, 896 A.2d 777 (2006) (obligation to inform patient of risks of blood transfusion is owed by physician performing surgery and him "alone" [emphasis omitted]).

B

The plaintiff's final claim is that the court erred in concluding that Yaari had no obligation to disclose to the plaintiff, in order to ensure that consent was informed, that the procedure could be better performed at another health care facility. The plaintiff argues that Yaari had an obligation to advise the plaintiff of the option of having a cesarean hysterectomy at another health care facility, more specifically, a "tertiary facility" with other specialists present, because Yaari reasonably anticipated that the procedure would require expertise beyond his specialty.[31] The defendant contends that the law of informed consent does not impose the obligation, at least in general, of advising a patient

that a different facility might provide more sophisticated care.

The following additional facts and procedural history, as recited by the trial court, are relevant. "Sometime after the plaintiff was admitted to the hospital on August 5, 1004, Yaari suspected and subsequently confirmed that she had placenta previa. . . . Yaari also suspected that the plaintiff had placenta accreta. Yaari tried to stop the contractions and, according to the contemporaneous hospital record, he 'explained to the [plaintiff] that there [was] a good chance that we might need to remove the uterus and there might be damage to the bladder during this kind of operation because of the location of the previous uterine incisions. The [plaintiff] consented. This was also explained to her husband.' . . .

"In her affidavit in opposition to the defendants' motions for summary judgment, however, the plaintiff state[d] that 'Yaari . . . did not advise me of the risks associated with undertaking a cesarean section in the presence of placenta accreta or placenta percreta nor did he tell me anything about my alternatives at that time (or in May 2004), including that of having my cesarean delivery take place at an appropriate tertiary facility and of having it handled by a team of specialists experienced in dealing with very difficult, potentially life-threatening lower abdominal surgery. . . . Yaari did not tell me that he suspected that I had placenta accreta or placenta percreta nor did he mention anything about my bladder or my ureters potentially being damaged should he go ahead with the surgery.' . . .

"The plaintiff signed a consent form giving Yaari permission to perform a 'repeat C-Section, Possible Hysterectomy, Possible [illegible].' Specifically, the form state[d]: 'My condition, the nature of the above procedure, risks and hazards of the procedure, the benefits of the procedure, any problems related to recuperation, the likelihood of success of the procedure, all viable alternatives to the procedure and the same type of information regarding such alternatives have been explained to my satisfaction by . . . Yaari.' Yaari also signed the consent form, affirming that he had provided the information to the plaintiff.

"After performing the cesarean section, Yaari discovered that the plaintiff in fact had placenta percreta and that the placenta had invaded the wall of the bladder causing substantial bleeding, requiring a hysterectomy. The contemporaneous hospital record signed by Yaari further states that the plaintiff 'was taken to the operating room and a cesarean section was performed. A live baby girl was delivered. . . . Because of the severe bleeding that we could not prevent . . . we had to pursue a cesarean hysterectomy. Because of the location of the placenta at the lower level of the uterus, it penetrated the posterior wall of the bladder and thus

was removed with the uterus and we called for intraoperative urology evaluation. The urology team arrived, headed by Dr. [Jeffrey] Small, and the patient had later on a reconstruction of the bladder and reimplantation of the one of the ureters.' "

On August 1, 2011, Yaari filed a motion for summary judgment, arguing that he was entitled to judgment as a matter of law because there was no genuine issue of material fact that he disclosed all material risks to the plaintiff.[32] The plaintiff opposed the motion, arguing that Yaari had a duty to advise her of the option of having a cesarean hysterectomy at a tertiary facility, with other physicians present, including a urologist and a gynecologist-oncologist. Yaari maintained that the law of informed consent did not impose such an obligation. The court granted Yaari's motion for summary judgment on December 30, 2011. The court held that "[u]nder the circumstances of this case, where the plaintiff concedes that she would have had a cesarean hysterectomy regardless of whether Yaari otherwise obtained her informed consent, and where there is no allegation nor evidence that Yaari was not competent, prepared and experienced to perform a cesarean hysterectomy, there is no genuine issue of material fact that . . . Yaari did not violate any duty to the plaintiff by not advising her that she might have the surgery performed by more experienced physicians or more specialized physicians."

We note initially that the plaintiff's "informed consent" claim has little to do with any known material risk of a cesarean hysterectomy and thus falls outside the usual rubric of informed consent. The plaintiff conceded, and our review of the record confirms, that there is no genuine issue of material fact that the plaintiff would have undergone a cesarean hysterectomy in any event—the plaintiff's counsel so indicated.[33] Further, the record indicates that the cesarean hysterectomy was necessary to save the plaintiff's life.[34] Additionally, the plaintiff did not allege, or present any evidence showing, that Yaari was not competent to perform the cesarean hysterectomy. The crux of the plaintiff's lack of informed consent claim as to Yaari is solely that Yaari "depriv[ed] her of the choice to seek the intervention of physicians more experienced in and/or specializing in dealing with this type of condition." Yaari contends that the current state of the law of informed consent in Connecticut imposes no such affirmative obligation on physicians.

None of our courts have addressed a claim closely analogous to the plaintiff's—that is, whether a physician has an obligation to inform his or her patient that a procedure may be better performed at another health care facility.[35] We hold that on the facts presented in this case, Yaari had no such obligation. Our holding is informed primarily by binding precedent such as *Shor-*

*tell* v. *Cavanagh*, supra, 300 Conn. 383, and *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 282, which suggest that the gravamen of informed consent is a discussion of the material risks of the procedure itself. The procedure itself does not necessarily extend to the place where the procedure is to be performed; in the circumstances of this case, the alleged fact that the facility was not a tertiary facility was not, as a matter of law, a material risk.[36]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] As the trial court explained: "Placenta previa is a condition in which the placenta is implanted in the lower segment of the uterus, thereby partially or completely obstructing the internal bone of the cervix. . . . Placenta accreta is a condition where the placenta has grown through the placental membrane and into the uterine wall, so that it cannot be detached without removing the uterus. . . . As this case and the literature indicates, placenta percreta is a condition in which the placenta can grow through the uterus and into the bladder." (Citations omitted.)

[2] According to the court, "On June 30, 2006, the court had granted the plaintiff's petition to extend the statute of limitations ninety days pursuant to General Statutes § 52-190a (b). The statute of limitations would otherwise have expired on August 5, 2006. The extended statute of limitations, therefore, was November 4, 2006."

[3] The court noted that "[a]lthough the complaint does not indicate whether the defendants are board certified, it is undisputed that both [defendants] are board certified obstetricians-gynecologists."

[4] On January 3, 2007, the plaintiff filed a request to amend and an amended complaint, the only material changes being (1) the original written opinion letter's author was revealed to be Jay Motola, a board certified urologist, and (2) the attachment of a second written opinion letter authored by Daniel Miller, an obstetrician-gynecologist. Neither defendant objected.

[5] On October 17, 2006, counsel for Yaari filed an appearance. His motion to dismiss was filed within thirty days of filing an appearance, as is required by Practice Book § 10-30.

[6] On October 18, 2006, counsel for Carrese filed an appearance. His motion to dismiss was filed within thirty days of filing an appearance, as is required by Practice Book § 10-30.

[7] On May 4, 2007, the defendants each filed motions to reargue claiming, inter alia, that in denying their motions to dismiss the court improperly had considered a subsequent complaint and opinion letter filed by the plaintiff. The court, *Jones, J.*, denied the defendants' motions to reargue, noting that it did not rely on the plaintiff's amended complaint or subsequent opinion letters in doing so.

[8] The plaintiff objected to the defendants' motions to dismiss, arguing that (1) the defendants' motions to dismiss were the functional equivalent of motions to reargue the prior rulings on the motions and were untimely under Practice Book § 11-12; (2) *Bennett* v. *New Milford Hospital, Inc.*, supra, 300 Conn. 1, should not be applied retroactively to this case; (3) the opinion letter attached to the plaintiff's good faith certificate was authored by a similar health care provider as defined by § 52-184c (c); (4) § 52-190a violates article second of the Connecticut constitution; and (5) judicial economy requires denial of the defendants' motions.

[9] The court filed its memorandum of decision on March 14, 2011, after having issued written orders granting the motions to dismiss on March 7, 2011. The plaintiff subsequently filed a motion to reargue on March 7, 2011, which the court denied in part. The plaintiff then filed an amended complaint on April 21, 2011.

[10] On January 11, 2012, the plaintiff filed a motion to reargue, which the court denied on January 30, 2012. On February 16, 2012, the plaintiff filed this appeal.

[11] Practice Book (2006) § 10-30 provides in relevant part: "Any defendant, wishing to contest the court's jurisdiction, may do so even after having entered a general appearance, but must do so by filing a motion to dismiss within thirty days of the filing of an appearance. . . ."

[12] General Statutes § 52-190a (a) provides in relevant part: "No civil action or apportionment complaint shall be filed to recover damages resulting from

personal injury or wrongful death occurring on or after October 1, 1987, whether in tort or in contract, in which it is alleged that such injury or death resulted from the negligence of a health care provider, unless the attorney or party filing the action or apportionment complaint has made a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. . . . [T]he claimant or the claimant's attorney . . . shall obtain a written and signed opinion of a similar health care provider, as defined in section 52-184c, which similar health care provider shall be selected pursuant to the provisions of said section, that there appears to be evidence of medical negligence and includes a detailed basis for the formation of such opinion. . . ."

[13] General Statutes § 52-184c (c) provides: "If the defendant health care provider is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a 'similar health care provider' is one who: (1) Is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty; provided if the defendant health care provider is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a 'similar health care provider'."

[14] Although the plaintiff may have obtained opinion letters from board certified obstetrician-gynecologists after the action commenced, after the defendants had filed their motions to dismiss, and after the statute of limitations had expired, the court may not consider those documents. See, e.g., *Votre* v. *County Obstetrics & Gynecology Group, P.C.*, 113 Conn. App. 569, 585, 966 A.2d 813, cert. denied, 292 Conn. 911, 973 A.2d 661 (2009).

[15] Practice Book (2006) § 10-30 (b) provides in relevant part: "Any defendant, wishing to contest the court's jurisdiction, may do so even after having entered a general appearance, but *must* do so by filing a motion to dismiss within thirty days of the filing of an appearance. . . ." (Emphasis added.)

Practice Book (2006) § 10-31 (a) provides in relevant part that "[t]he motion to dismiss shall be used to assert (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, and (5) insufficiency of service of process. . . ."

[16] On January 31, 2011, Yaari moved to dismiss the plaintiff's September 15, 2006 complaint pursuant to § 52-190a (c), on the ground that the plaintiff's complaint did not comply with the requirements of § 52-190a because the written good faith opinion letter was not authored by a health care provider similar to Yaari. On February 10, 2011, Carrese filed a motion to dismiss on similar grounds.

[17] The defendants' 2006 motions to dismiss—filed on November 13, 2006, and November 15, 2006, respectively—raised the issue of the adequacy of the plaintiff's § 52-190a opinion letter and were denied by the court, *Jones, J.*, on April 16, 2007.

[18] Practice Book § 11-12 (a) provides: "A party who wishes to reargue a decision or order rendered by the court shall, within twenty days from the issuance of notice of the rendition of the decision or order, file a motion to reargue setting forth the decision or order which is the subject of the motion, the name of the judge who rendered it, and the specific grounds for reargument upon which the party relies."

[19] On March 7, 2011, the court granted the defendants' motions to dismiss the entire complaint. The court subsequently vacated its decision as to the plaintiff's claims of lack of informed consent, the result of which was that only the professional negligence claims remained dismissed.

[20] We note that the defendants' 2006 motions to dismiss were timely filed in accordance with Practice Book (2006) § 10-30 because they were filed within thirty days of the defendants' counsel filing their appearances in this case.

[21] On appeal, the plaintiff also now claims that the court, *Levin, J.*, improperly considered the defendants' 2011 motions to dismiss because the 2011 motions to dismiss were motions to reargue Judge Jones' earlier denial of their 2006 motions to dismiss. The motions were not decided by the same judge who denied their earlier motions to dismiss, as is required by Practice Book § 11-12 (c). Practice Book § 11-12 (c) provides in relevant part that "[a] motion to reargue shall be considered by the judge who rendered the decision or order. . . ." The plaintiff did not raise this argument in her written objection to the defendants' 2011 motions to dismiss or at the hearing on the defendants' 2011 motions to dismiss. Because the plaintiff raises this argument for the first time on appeal, we find it was not preserved, and we

decline to address it.

[22] On cross appeal, the defendants argue that if this court finds that Judge Levin properly could not reconsider Judge Jones' denial of the defendants' original 2006 motions to dismiss, then this court should find, nonetheless, that Judge Jones' denials of the 2006 motions to dismiss were improper under *Bennett* v. *New Milford Hospital, Inc.*, supra, 300 Conn. 1. Because we find that the court, *Levin, J.*, properly considered the defendants' 2011 motions to dismiss, we find it unnecessary to address the defendants' argument on cross appeal.

[23] Unusual practical considerations were presented here. The trial court correctly determined that *Bennett* was to have retroactive effect. See, e.g., *Marone* v. *Waterbury*, 244 Conn. 1, 10, 707 A.2d 725 (1998) ("judgments that are not by their terms limited to prospective application are presumed to apply retroactively"). In light of *Bennett*, the court was faced with a situation in which any judgment rendered on the professional negligence issues in favor of the plaintiff would likely be reversed in any event. By dealing with the issue, the court avoided the time and expense, to the state and to the parties, of a perhaps pointless trial.

[24] Where appropriate, the operative procedures involving the cesarean section and the hysterectomy will be referred to collectively as "the cesarean hysterectomy."

[25] "The party opposing a motion for summary judgment must present evidence that demonstrates the existence of some disputed factual issue. . . . The movant has the burden of showing the nonexistence of such issues but the evidence thus presented, if otherwise sufficient, is not rebutted by the bald statement that an issue of fact does exist. . . . To oppose a motion for summary judgment successfully, the nonmovant must recite specific facts . . . which contradict those stated in the movant's affidavits and documents. . . . The opposing party to a motion for summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Internal quotation marks omitted.) *Milton* v. *Robinson*, 131 Conn. App. 760, 779, 27 A.3d 480 (2011), cert. denied, 304 Conn. 906, 39 A.3d 1118 (2012).

[26] "[T]he focus of a medical malpractice case is often a dispute involving the correct medical standard of care and whether there has been a deviation therefrom. Conversely, the focus in an action for lack of informed consent is often a credibility issue between the physician and the patient regarding whether the patient had been, or should have been, apprised of certain risks prior to the medical procedure." *Shortell* v. *Cavanagh*, 300 Conn. 383, 389, 15 A.3d 1042 (2011); see also *Caron* v. *Adams*, 33 Conn. App. 673, 687, 638 A.2d 1073 (1994) ("the basis for claiming a lack of informed consent is a failure to make a sufficient disclosure of the risks of or alternatives to a certain medical procedure or treatment").

[27] "Our standard of disclosure for informed consent in this state is an objective standard that does not vary from patient to patient based on what the patient asks or what the patient would do with the information if it were disclosed. As this court stated in [*Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 292–93, 465 A.2d 294 (1983)], the lay standard of informed consent requires a physician to provide the patient with that information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy. . . . In adopting the objective lay standard, this court recognized that rather than impose on the physician an obligation to disclose at his peril whatever the particular patient might deem material to his choice, most courts have attempted to frame a less subjective measure of the physician's duty." (Emphasis omitted; internal quotation marks omitted.) *Duffy* v. *Flagg*, 279 Conn. 682, 692, 905 A.2d 15 (2006).

[28] The plaintiff also argues that the court improperly relied on cases involving the duties of referring physicians because Carrese was not a referring physician. We agree with the plaintiff that Carrese was not a referring physician. We note that the trial court, however, in discussing cases involving the duties of referring physicians, stated that "[h]ere, Carrese was not even a referring physician."

[29] Carrese argues that the plaintiff did not properly allege lack of informed consent and notes that the first time the plaintiff argued that there was a pending lack of informed consent claim was in seeking to reargue the dismissal of her medical malpractice claims. Carrese argues that count one of the original complaint alleged medical negligence against Carrese and not lack of informed consent. Lack of informed consent is a cause of action

separate from a claim of medical negligence and arises from a different set of facts. See, e.g., *Hammer* v. *Mount Sinai Hospital*, 25 Conn. App. 702, 706, 596 A.2d 1318, cert. denied, 220 Conn. 933, 599 A.2d 384 (1991). The plaintiff, therefore, had the burden, pursuant to Practice Book § 10-26, to plead the lack of informed consent claim in a separate count properly to put Carrese on notice of that claim. We note that regardless of whether the plaintiff properly alleged a cause of action that was based on lack of informed consent in the original complaint, the court ordered the defendants to address the plaintiff's claimed cause of action of lack of informed consent, the defendants had notice of such claim, and the defendants may have implicitly agreed to allow the plaintiff to amend her complaint to include this cause of action by not objecting. Even if the plaintiff did not plead lack of informed consent in her original complaint, in light of the defendants' actions and notice of the plaintiff's lack of informed consent claims, we decline to address the defendants' argument further.

[30] Because the procedure was to be performed in the future and Carrese was never in the position to be the operating surgeon, we conclude that Carrese had no obligation to obtain informed consent. We do not address the broader issue of whether the applicable standard of care was deviated from in the course of the plaintiff's care.

[31] The court stated: "At oral argument on the defendants' motions [for summary judgment], the plaintiff clarified that the crux of her claim was not that she would not have had a cesarean section or a hysterectomy if provided with additional information, but rather that she should have been told that the procedure should have been completed at a 'tertiary facility,' by a more skilled surgeon, with a team of specialists present."

[32] The court held that there was no genuine issue of material fact that the plaintiff would have undergone a cesarean hysterectomy.

[33] The plaintiff's attorney made the following remarks at the hearing on the defendants' motions for summary judgment:

"[The Plaintiff's Counsel]: Thank you, Your Honor. Your Honor, as to the—just addressing quickly the informed . . . consent form that the defendant, Dr. Yaari has provided a copy of . . . all it says is repeat [cesarean] section and possible hysterectomy. It says something else, possible greater, I can't read the words, but it says nothing, Your Honor, and the testimony is . . . at no time did Dr. Yaari tell [the plaintiff] that because she'd had multiple prior [cesarean] sections and had a placenta previa, she was at a substantially increased risk of suffering from placenta percreta and/or placenta accreta. Placenta percreta is a more advanced or complicated version. And in fact, she did suffer from placenta percreta. And he never had a percreta or accreta discussion with her ever, Your Honor. . . .

"The Court: What would have changed if she had? . . .

"[The Plaintiff's Counsel]: What would have changed, Your Honor, firstly, in May of 2004, she was at Bridgeport Hospital. Dr. Yaari was again covering for Dr. Carrese and was the responsible physician. . . . And the hospital [record] says . . . suspected placenta previa, will tell Dr. Yaari when he calls in an hour, something to that effect.

"And so, that he knew so months before the delivery, it is our position, and it certainly is an issue of fact on this, at least that she had a placenta previa condition, and he knew about her prior [cesarean] sections. Under those circumstances . . . [w]hat . . . we're saying is that, well, certainly she should have been given the risks and the alternatives to that. . . .

"The Court: This is *alternatives to what*?

"[The Plaintiff's Counsel]: . . . [*T*]*o having Dr. Carrese and/or Dr. Yaari perform this cesarean section, cesarean section hysterectomy.* A lot of them are saying, and most—certainly all the plaintiff's experts and a number of the defendant's experts, that it would have been preferable to have an experienced general pelvic surgeon. It's [a] very unusual occurrence, this placenta accreta, in the life of an . . . obstetrician-gynecologist. And it's— it's the plaintiff's position that she would have liked to have known that she was in an elevated risk of suffering lower urinary tract injury and that she could have gone and *she would like to have known the alternative of going to, and having present, an experienced, let's say, gynecological oncologist to this procedure on her.* . . .

"The Court: Gynecological oncologist, did you say?

"[The Plaintiff's Counsel]: Yes. Yes, Your Honor, in other words, a doctor who specializes in complicated lower urinary tract surgeries, for example. So, rather—and she could have, if she'd known, if this had been brought to her attention . . . you know, she could have had an alternative of having somebody who specializes in this kind of complicated condition deal with it. In fact, she was told nothing about it. She only found [out] about placenta percreta, placenta accreta, after the delivery. They told her nothing about it.

"And, in fact, Dr. [Frank] Boehm, Dr. Yaari's expert, says that Dr. Yaari knew ahead of time or suspected strongly that she had an accreta. And . . . Dr. [Jeffrey] Richardson, one of the plaintiff's experts, testified that, in fact, he suspected that she—oh, testified that Dr. Yaari did anticipate on August 5, before the delivery was attempted, there was a placenta accreta and/or percreta present, and that urologic injury could occur during the procedure.

"And that because of knowing about it ahead of time, he, quote, he had the luxury of time. In other words, we don't accept that there is an emergency exception, Your Honor. I believe that all that the defendant has cited to on this issue is a state regulation, it's not a statute, that simply says that hospitals should make sure that doctors get informed consent. That's essentially what that regulation says. It doesn't say anything about doctors don't have to get informed consent if there's an emergency.

"But beyond that, it's our position, Your Honor, that there was not an emergency, that . . . there was sufficient time for [the plaintiff] to give informed consent, to have a discussion about possible bladder injury, about possible urethral injury, about an option of having a urologist or a gynecological oncologist deal with the procedure. She wasn't given any of these options. She was not told the risks. She was not told the alternatives. And, Your Honor, it's the plaintiff's position that that's exactly what informed consent is about. She should have been told of these risks and alternatives, and she was not . . .

"The Court: *What . . . other alternatives were there, again, other than you mentioned an experienced pelvic surgeon or gynecological oncologist?*

"[The Plaintiff's Counsel]: *She would have, Your Honor, have had to undergo an operation where her uterus was removed. She would have had to undergo a hysterectomy.* But, Your Honor, it is our view that had she been given this option of going with someone who knew what he was doing and did this as a specialist, she would not be permanently unable to use the bathroom today. She wasn't given that option because she wasn't told about it." (Emphasis added.)

[34] In its memorandum of decision, the court stated: "In the deposition of Dr. Frederick Rau, an obstetrician-gynecologist, the following exchange occurred:

"Q. And in reviewing all the records, have you developed any opinions as to whether or not . . . Yaari conformed to the standard of care in his care and treatment of [the plaintiff] in this particular situation?

"A. I believe that . . . Yaari did conform to the standard of care in this very difficult situation. . . . I don't think he had any choice but to proceed with the operation, perform the cesarean hysterectomy, and then manage the bleeding and urologic issues after the hysterectomy.

"Yaari submitted a portion of an uncertified deposition transcript of Dr. Jeffrey Richardson, an obstetrician-gynecologist, who testified that the hysterectomy saved the plaintiff's life. The pertinent deposition testimony is as follows:

"Q. Okay. Did the hysterectomy that was done in this case save [the plaintiff's] [life]? . . .

"A. I would say the hysterectomy saved her [life]."

"Additionally, the plaintiff submitted a portion of a certified deposition transcript of Dr. Frank Boehm, an obstetrician-gynecologist, who testified that the circumstances of the plaintiff's case constituted a life-threatening situation. The pertinent deposition testimony is as follows:

"A. [T]his is a life-threatening situation, placenta percreta with a previa. The amount of blood loss was obviously enormous; the [plaintiff] received nine units of blood." (Emphasis omitted.)

[35] The Wisconsin Supreme Court addressed an analogous claim in *Adler* v. *Kokemoor*, 199 Wis. 2d 615, 545 N.W.2d 495 (1996) (where plaintiff produced evidence showing defendant misrepresented mortality rates and his experience performing surgery, with respect to lack of informed consent claim, court properly allowed plaintiff to introduce evidence showing decreased risk of complications had plaintiff undergone neurosurgery for aneurysm at a tertiary care facility). In *Adler*, the court considered whether a trial court was correct in allowing the plaintiff to present evidence that the defendant physician should have advised the plaintiff of the possibility of undergoing surgery at a tertiary care facility with a more experienced surgeon. While we are not bound by *Adler*, we note that the facts of *Adler*—which involved a physician who misrepresented mortality rates and did not disclose the fact that, although he had performed thirty operations to clip anterior circulation aneurysms, he had never performed operations to clip the significantly more complicated posterior circulation aneurysms like the one from which the plaintiff suffered—are wholly unlike the facts of this case.

[36] We do not foreclose the possibility that, in other circumstances, analogous factors may appropriately be regarded to be material risks subject to consideration by a jury. For example, we do not necessarily rule out a surgeon's complete lack of experience or a grossly unsanitary operating facility as a material risk attendant to the procedure. In this matter, risks material *to the procedure* were disclosed, and there was never a suggestion that the surgeon was not competent to perform the procedure. The plaintiff now asserts that, had she known of all of the possible sequelae and places where the surgery perhaps could have been performed, she would have opted for a "tertiary facility." Although, as noted previously, we express no opinion as to whether the issue raises questions of professional negligence, we do not hold that advising as to "tertiary facilities" was required on the facts of this case. There was no evidence that this facility was substandard and, in any event, there is almost always a more prestigious facility somewhere.