******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

*Syllabus*

The plaintiff patient sought to recover damages from the defendant R, a
licensed gynecological oncologist, alleging that R's conduct during a
certain postoperative examination constituted battery and the negligent
infliction of emotional distress. The plaintiff alleged that she underwent
a surgical procedure known as a laser ablation of the vulva that was
performed by R, and that he, having subsequently discovered during the
postoperative examination that the plaintiff's labia were agglutinated,
digitally separated her agglutinated labia without providing her with any
warning or notice. R filed a motion to dismiss, claiming that the plaintiff's
claims against him were for medical malpractice and, as such, the plain-
tiff was required by statute (§ 52-190a) to attach to the complaint a
certificate of good faith and a written opinion letter of a similar health
provider. The trial court found that the claims were for medical malprac-
tice and, thus, granted the motion to dismiss without prejudice to the
plaintiff filing a separate action claiming a lack of informed consent.
The plaintiff then filed a revised complaint claiming that R had failed
to obtain her informed consent before embarking on a course of medical
treatment for a complication that he discovered during the postoperative
examination. Subsequently, R filed a motion for summary judgment,
which the court granted on the ground that R's conduct in separating
the plaintiff's agglutinated labia was not a separate procedure or course
of treatment giving rise to a duty to obtain informed consent but was,
instead, a part of another examination for which R had received the
written consent of the plaintiff. On appeal, the plaintiff challenged the
trial court's conclusion and, specifically, claimed that although R had
obtained her informed consent to perform the laser ablation of her vulva
and, as part of that course of treatment, to perform a postoperative
examination, a substantial change in circumstances occurred when R
discovered a complication during the postoperative examination that
required medical intervention, which in turn obligated R to obtain her
informed consent before proceeding further. *Held*:

1. The trial court improperly granted R's motion to dismiss the plaintiff's
   battery and negligent infliction of emotional distress counts due to
   the plaintiff's noncompliance with § 52-190a: the written opinion letter
   requirement of § 52-190a did not apply to the plaintiff's battery claim, as
   our Supreme Court has held that the written opinion letter requirement
   contained in § 52-190a applies only to claims of medical negligence, and
   the plaintiff's battery claim, which contained no allegations of negligence
   on the part of R and did not allege any deviation from the applicable
   standard of care, was predicated on the alleged lack of informed consent
   and was, thus, not subject to that requirement; moreover, the plaintiff's
   negligent infliction of emotional distress count was not a claim of medi-
   cal negligence subject to the requirements of § 52-190a, as that count
   lacked any allegation that R departed from the applicable standard of
   care, and it was, instead, derivative of the plaintiff's battery claim, as
   it concerned her general theory that R lacked informed consent to
   digitally separate her agglutinated labia.

2. The trial court improperly rendered summary judgment in favor of R
   on the plaintiff's revised complaint: when a substantial and material
   alteration of the risks, anticipated benefits, or alternatives previously
   disclosed to the patient occurs during a course of medical treatment, the
   doctrine of informed consent generally requires an additional informed
   consent discussion between the physician and the patient, and, in the
   present case, a genuine issue of material fact existed as to whether R's
   discovery of the plaintiff's medical complication during the postopera-
   tive examination constituted a substantial and material change in circum-
   stances, such that R was obligated to disclose the risks, anticipated
   benefits, and viable alternatives to the plaintiff before embarking on a

course of treatment, as a finder of fact could have concluded on the basis of certain statements in the affidavits of the plaintiff and her mother, which alleged that R, after separating the plaintiff's agglutinated labia, informed them that he performed that procedure so that the plaintiff would not have to go to the operating room for surgery, as well as R's admission that severely agglutinated labia may require a surgical procedure and evidence from both parties of the significant pain experienced by the plaintiff, that R discovered the medical complication during his initial examination of the plaintiff and then, without her informed consent, made a unilateral decision to pursue a particular course of treatment, namely, digital separation, when another viable alternative existed; moreover, although a physician's failure to obtain informed consent may be excused in certain circumstances, such as when the patient has authorized the physician to remedy complications that arise during a course of medical treatment, a genuine issue of material fact existed as to whether the plaintiff had authorized R to remedy unforeseen complications that arose, not during her laser ablation procedure but, rather, during the postoperative examination that occurred weeks later, as the plaintiff's signed consent form, when read in the light most favorable to the plaintiff as the nonmoving party, authorized R to take whatever action may be necessary only with respect to unforeseen complications that arose during the laser ablation procedure and did not discuss postoperative care.

Argued May 22, 2018—officially released January 8, 2019

*Procedural History*

Action to recover damages for, inter alia, battery, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Radcliffe, J.*, granted the named defendant's motion to dismiss; thereafter, the court granted the plaintiff's motion to cite in the named defendant as a party defendant and the plaintiff filed an amended complaint; subsequently, the court granted the motion to dismiss filed by the defendant Yale University and rendered judgment thereon; thereafter, the court granted the named defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court. *Reversed*; *further proceedings*.

*John L. Cesaroni*, with whom was *James R. Miron*, for the appellant (plaintiff).

*Tadhg Dooley*, with whom, on the brief, was *Jeffrey R. Babbin*, for the appellee (named defendant).

*Opinion*

ELGO, J. This case concerns the conduct of a physician who discovered a complication during a postoperative examination. The plaintiff, Lauren Wood, appeals from the trial court's dismissal of her August 25, 2015 amended complaint, which alleged one count of battery and one count of negligent infliction of emotional distress against the defendant, Thomas J. Rutherford, M.D.[1] The plaintiff claims that the court improperly concluded that those counts sounded in medical malpractice and, thus, required compliance with General Statutes § 52-190a. The plaintiff also challenges the propriety of the summary judgment rendered by the court on her February 8, 2016 revised complaint, which alleged that the defendant failed to obtain her informed consent before embarking on a course of treatment for a complication discovered during a postoperative examination. We agree with the plaintiff that the court improperly dismissed the battery and negligent infliction of emotional distress counts of her August 25, 2015 amended complaint, as those counts were predicated on an alleged lack of informed consent. We further conclude that a genuine issue of material fact exists as to whether a substantial change in circumstances occurred during the course of medical treatment that necessitated a further informed consent discussion between the parties, rendering summary judgment inappropriate. We, therefore, reverse the judgment of the trial court.

The operative complaints, the plaintiff's August 25, 2015 amended complaint and her February 8, 2016 revised complaint, contain similar factual allegations. In both, the plaintiff alleged that, at all relevant times, she was a patient of the defendant, a licensed gynecological oncologist. She further alleged that "[o]n April 25, 2014, the plaintiff underwent a surgical procedure known as a $CO_2$ laser ablation[2] of the vulva [to remove precancerous growths] that was performed by [the defendant] at Yale University Gynecologic Center . . . . On May 14, 2014, upon the advice of [the defendant], the plaintiff returned to Yale University Gynecologic Center for a postoperative examination. During the postoperative examination . . . [the defendant] discovered that the plaintiff's labia [were] agglutinated.[3] During the postoperative examination . . . [the defendant], *without any warning or notice to or consent from the plaintiff* . . . forcefully inserted his fingers through the plaintiff's agglutinated labia and into her vagina." (Emphasis added; footnotes added.) The plaintiff further alleged that she sustained injuries as a result thereof, including "scarring and impairment to her vulva and vagina . . . ."

The plaintiff commenced this action in 2015. Her August 25, 2015 amended complaint contained two counts against the defendant that alleged that his con-

duct during the postoperative examination constituted battery and negligent infliction of emotional distress. In response, the defendant filed a motion to dismiss, in which he argued that "regardless of the caption applied to them by the plaintiff, both of the claims . . . are for medical malpractice. As such, the plaintiff is required by [§] 52-190a[4] to attach to the complaint a good faith certificate and written opinion letter. The plaintiff's failure to attach these documents is fatal to her claim and mandates that it be dismissed." (Footnote added.)

The court heard argument from the parties on that motion on October 19, 2015, at which the plaintiff's counsel acknowledged that the plaintiff had consented to the postoperative examination on May 14, 2014, but not to the defendant forcefully separating her agglutinated labia without warning or notice to her.[5] The plaintiff's counsel emphasized that, in her complaint, the plaintiff did not "allege that there was a deviation of the standard of care. . . . We don't allege negligence in this case." Counsel then stated that count one of the complaint "is not a negligence case. Count one is a battery case, and the theory of battery as a basis for recovery" against the defendant was his failure to obtain informed consent. Counsel continued: "We don't claim negligence at all. Our claim here is that [the plaintiff] had no knowledge . . . and was not informed . . . and didn't consent to [the defendant] sticking his fingers into her vagina the way he did . . . ." In response, the court stated in relevant part: "[Y]ou certainly have every right to plead that this was a surgical procedure, that there was a lack of informed consent and, as a result of a lack of informed consent, the plaintiff sustained damages . . . . That you can do. You can't transform . . . what amounts to a medical negligence or malpractice claim into a tortious action for purposes of circumventing § 52-190a . . . ." The court then made an express finding that the three factors determinative of whether a negligence claim sounds in medical malpractice[6] all were satisfied. The court thus granted the motion to dismiss "without prejudice to the plaintiff filing a separate action claiming a lack of informed consent . . . ."[7]

Nine days later, the plaintiff requested leave to amend her complaint pursuant to Practice Book § 10-60, which the court granted. The plaintiff thereafter filed an amended complaint claiming that the defendant had failed to obtain her informed consent before embarking on a course of treatment for a complication that he discovered during the postoperative examination. More specifically, the plaintiff alleged in her February 8, 2016 revised complaint that the defendant's actions during the postoperative examination "violated his duty to provide the plaintiff with information that a reasonable patient would have found material for making a decision to embark upon the course of treatment performed by

[the defendant] in that: (a) [the defendant] failed to inform the plaintiff as to the nature of the procedure he performed because he did not give her any warning or explanation of said procedure; (b) [the defendant] failed to disclose any risks and hazards of the procedure; (c) [the defendant] failed to discuss any alternatives to the procedure he performed where, upon information and belief, other procedures were available; and (d) [the defendant] failed to disclose any anticipated benefits of the procedure he performed." In his answer, the defendant admitted that, while conducting the postoperative examination, he discovered that the plaintiff's labia were agglutinated. He further admitted that "during the postoperative examination, [he] separated the skin of the labia by inserting a finger through the agglutination."[8] The defendant otherwise denied the substance of the plaintiff's lack of informed consent claim.

On October 3, 2016, the plaintiff filed a certificate of closed pleadings with the trial court, in which she claimed a jury trial. The defendant filed a motion for summary judgment on November 15, 2016, arguing that "[t]here is no triable issue of fact . . . because the incident in question—the separation of agglutinated labia during a postoperative examination of the plaintiff's vagina—was not a 'procedure' requiring consent. Even if it [was], the plaintiff consented to [the defendant] performing the vaginal exam, which necessarily included separating her labia to observe the surgical site." That motion was accompanied by three exhibits, including the defendant's November 4, 2016 affidavit and his August 17, 2016 responses to the interrogatories of the plaintiff.

On January 23, 2017, the plaintiff filed an objection to the motion for summary judgment, arguing that the defendant, after discovering the complication during the postoperative examination, "performed an invasive procedure, which constitutes a course of treatment triggering a physician's duty to inform." The plaintiff noted that the "cases that find a course of treatment that triggers a physician's duty to provide informed consent share the fact that they involve the physician providing, or attempting to provide, a therapeutic remedy to the plaintiff. The mechanism of the treatment itself is not important, but rather, the key element is that a medical treatment was provided." Because the defendant provided a medical treatment to remedy her labial agglutination, the plaintiff argued that he was obligated to apprise her of "any material risks or alternatives" prior to embarking on that course of treatment. In support of her assertion that the defendant provided a medical treatment, the plaintiff appended to her objection (1) a copy of her answers to certain interrogatories, (2) affidavits of the plaintiff and her mother, Janice Andersen, and (3) copies of five Superior Court decisions.

The defendant filed a reply to the plaintiff's objection on February 1, 2017, in which he maintained that the plaintiff's consent to the laser ablation procedure included her consent to the postoperative examination, as that examination was "not a separate course of therapy from the operation." The defendant further submitted that "[t]he uncontroverted evidence shows that [he] had to separate the plaintiff's labia, which were agglutinated, in order to examine the surgical site." A copy of the plaintiff's signed consent to the laser ablation procedure was included as an exhibit to that reply.[9]

The court held a hearing on the motion for summary judgment on February 6, 2017, at which the defendant's counsel contended that the May 14, 2014 postoperative examination did not involve a procedure of any kind. The court then inquired as to whether the plaintiff's counsel had "any authority that says that this type of thing is a procedure"; counsel responded that there was "nothing in Connecticut that says that this . . . is or is not a course of treatment under the standard [set forth] in *Logan* [v. *Greenwich Hospital Assn.*, 191 Conn. 282, 292, 465 A.2d 294 (1983)]." The plaintiff's counsel nevertheless argued that, after discovering the labial agglutination, the defendant failed to disclose to the plaintiff the nature of the course of treatment he ultimately undertook to resolve that medical complication. Counsel reminded the court that the affidavits submitted by the plaintiff and Andersen in opposition to the motion for summary judgment both indicated that the defendant told them that he performed the digital separation of the agglutination "to avoid having to go into the operating room" to resolve that complication.[10] Counsel then rhetorically asked what the difference was between a course of treatment in an operating room and a course of treatment in an examination room, before stating: "[T]he take home message is that the form of treatment is not what's important. It's that the doctor . . . and the patient embark on a course of treatment, and the patient has to go into it with open eyes, and that just didn't happen here." The plaintiff's counsel concluded his remarks by noting that the defendant "provided a treatment. [The plaintiff's] labia [were] fused together, and he separated [them]. There certainly is some evidence that [separation] could have been done in an operating room, and maybe it should have. [The plaintiff] deserves to be able to explore that. And certainly if [the defendant] can refute that, that's fine, but it's an issue of fact to be decided in this case by the trier of fact . . . ."

When those arguments concluded, the court stated that it "makes a finding that the activities of [the defendant], in examining the surgical site following a surgical procedure which took place three weeks earlier, is not a procedure which would give rise to the duty to inform the plaintiff that a certain portion of the examination

of the surgical site might induce pain and [to conclude otherwise] would extend the definition of a surgery far afield. Under *Logan* [v. *Greenwich Hospital Assn.*, supra, 191 Conn. 292], informed consent deals with a procedure, an operation or surgery. This was not an operation. It was not surgery. It was not a procedure in and of itself. It was, rather, part of another examination for which the [defendant] received the written consent of the plaintiff. So, the motion for summary judgment is granted." Accordingly, the court rendered judgment in favor of the defendant, and this appeal followed.

I

We first consider the plaintiff's challenge to the dismissal of her August 25, 2015 amended complaint against the defendant. Although that complaint contained counts labeled battery and negligent infliction of emotional distress, the trial court determined that, despite the nomenclature employed by the plaintiff, those counts both sounded in medical malpractice. As a result, the court held that the plaintiff's failure to comply with the strictures of § 52-190a required dismissal of those counts due to lack of personal jurisdiction. That determination warrants closer scrutiny.

"When a . . . court decides a . . . question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *CitiMortgage, Inc.* v. *Gaudiano*, 142 Conn. App. 440, 441, 68 A.3d 101, cert. denied, 310 Conn. 902, 75 A.3d 29 (2013); see also *Morgan* v. *Hartford Hospital*, 301 Conn. 388, 395, 21 A.3d 451 (2011) ("[i]n any consideration of the trial court's dismissal, we take the facts as alleged in the complaint as true"). As our Supreme Court has recognized, the failure to attach a proper written opinion letter pursuant to § 52-190a to a complaint alleging injury due to the medical negligence of a health care provider "implicates personal jurisdiction" and mandates the dismissal of an action. *Morgan* v. *Hartford Hospital*, supra, 402; see also General Statutes § 52-190a (c) (failure to provide written opinion letter "shall be grounds for the dismissal of the action"). "Our review of a trial court's ruling on a motion to dismiss pursuant to § 52-190a is plenary." *Torres* v. *Carrese*, 149 Conn. App. 596, 608, 90 A.3d 256, cert. denied, 312 Conn. 912, 93 A.3d 595 (2014).

The present case requires us to construe the nature of the causes of action alleged in the plaintiff's August 25, 2015 amended complaint to determine whether compliance with § 52-190a was necessary.[11] "The interpretation of pleadings is always a question of law for the court

. . . . Our review of the trial court's interpretation of the pleadings therefore is plenary. . . . [W]e long have eschewed the notion that pleadings should be read in a hypertechnical manner. Rather, [we must] construe pleadings broadly and realistically, rather than narrowly and technically. . . . [A] pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension. . . . Although essential allegations may not be supplied by conjecture or remote implication . . . the complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties." (Citations omitted; internal quotation marks omitted.) *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 536–37, 51 A.3d 367 (2012).

A

Battery

We begin with the first count of the August 25, 2015 amended complaint. It alleges in relevant part that, during the postoperative examination, the defendant "without any warning or notice or consent from the plaintiff, intentionally, wantonly and/or forcefully inserted his fingers through the plaintiff's agglutinated labia and into her vagina." Count one further alleges that the defendant's conduct "constituted a battery in that his actions were harmful and/or offensive to the plaintiff" and concludes by alleging a variety of injuries that the plaintiff sustained as the "result of the harmful and/or offensive conduct" of the defendant. In dismissing that count, the court concluded that those allegations constituted a claim of medical negligence on the part of the defendant, which necessitated compliance with § 52-190a. We disagree.

As the plaintiff emphasized at the hearing on the defendant's motion to dismiss, and as the complaint plainly indicates, her battery claim was predicated on the lack of informed consent. Our Supreme Court has "long recognized the principle that [e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages." (Internal quotation marks omitted.) *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 136, 757 A.2d 516 (2000). In *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 289, the Supreme Court clarified that a patient can recover on a "theory of battery as a basis for recovery" against a physician in three limited circumstances: (1) when a physician performs a procedure other than that for which consent was granted; (2) when a physician performs a procedure without obtaining any consent from the patient; and

(3) when a physician realizes that the patient does not understand what the procedure entails. This court similarly has observed that "[o]ur courts have long adhered to the principle that the theory of intentional assault or battery is a basis for recovery against a physician who performs surgery without consent." *Chouinard* v. *Marjani*, 21 Conn. App. 572, 579, 575 A.2d 238 (1990); see also *Canterbury* v. *Spence*, 464 F.2d 772, 783 (D.C. Cir.) ("[i]t is the settled rule that therapy not authorized by the patient may amount to . . . a common law battery"), cert. denied, 409 U.S. 1064, 93 S. Ct. 560, 34 L. Ed. 2d 518 (1972); *Schmeltz* v. *Tracy*, 119 Conn. 492, 495, 177 A. 520 (1935) ("if the lack of consent was established, the removal of the moles [by the physician] was in itself a trespass and had the legal result of an assault"); *Torres* v. *Carrese*, supra, 149 Conn. App. 621 n.29 ("[l]ack of informed consent is a cause of action separate from a claim of medical negligence"); *Shadrick* v. *Coker*, 963 S.W.2d 726, 732 (Tenn. 1998) ("the doctrine of lack of informed consent is based upon the tort of battery, not negligence, since the treatment or procedure was performed without having first obtained the patient's informed consent").

Count one contains no allegations of negligence on the part of the defendant. It likewise does not allege any deviation from the applicable standard of care.[12] The strictures of § 52-190a, therefore, do not apply to that cause of action. Section 52-190a was enacted "to prevent the filing of frivolous medical malpractice actions." *Morgan* v. *Hartford Hospital*, supra, 301 Conn. 398. By its plain language, that statute applies to actions "to recover damages resulting from personal injury or wrongful death . . . whether in tort or in contract, in which it is alleged that such injury or death resulted from the *negligence* of a health care provider . . . ." (Emphasis added.) General Statutes § 52-190a (a). Significantly, our Supreme Court has held that the written opinion letter requirement contained in § 52-190a applies only to claims of medical negligence, which is defined as "the failure to use that degree of care for the protection of another that the ordinarily reasonably careful and prudent [person] would use under like circumstances. . . . It signifies a want of care in the performance of an act, by one having no positive intention to injure the person complaining of it." (Internal quotation marks omitted.) *Dias* v. *Grady*, 292 Conn. 350, 354, 972 A.2d 715 (2009); see also *Wilkins* v. *Connecticut Childbirth & Women's Center*, 314 Conn. 709, 723 n.4, 104 A.3d 671 (2014) ("§ 52-190a applies only to claims of medical malpractice"); *Dias* v. *Grady*, supra, 359 ("the phrase 'medical negligence,' as used in § 52-190a (a), means breach of the standard of care").

In *Shortell* v. *Cavanagh*, 300 Conn. 383, 385, 15 A.3d 1042 (2011), the Supreme Court expressly held that a cause of action against a physician predicated on a lack of informed consent is not subject to the written opinion

letter requirement of § 52-190a. The court explained that "[u]nlike a medical malpractice claim, a claim for lack of informed consent is determined by a lay standard of materiality, rather than an expert medical standard of care which guides the trier of fact in its determination." Id., 388; see also *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 293 (adopting lay standard for informed consent claims). Accordingly, "in an informed consent case, the plaintiff is not required to present the testimony of a similar health care provider regarding the standard of care at trial." *Shortell* v. *Cavanagh*, supra, 389. The court thus reasoned that "[i]t would not be logical that an opinion from a similar health care provider would be required to commence an action of this nature, when the testimony of a medical expert would not be necessary at trial to prove the standard of care and its breach." Id., 388. To do so would "frustrate the purpose of using the lay standard for informed consent cases if we were to require a plaintiff in such a case to comply with § 52-190a and attach to the complaint a good faith certificate and written opinion of a similar health care provider." Id., 391.

In count one of her August 25, 2015 amended complaint, the plaintiff alleges that the defendant committed a battery through his intentional conduct during the postoperative examination by failing to obtain her informed consent prior to digitally separating her agglutinated labia. "[M]edical standards of care are inapplicable" to such claims. *Chouinard* v. *Marjani*, supra, 21 Conn. App. 580; accord *Sherwood* v. *Danbury Hospital*, 278 Conn. 163, 180, 896 A.2d 777 (2006) ("[u]nlike the traditional action of [medical] negligence, a claim for lack of informed consent focuses not on the level of skill exercised in the performance of the procedure itself but on the adequacy of the explanation given by the physician in obtaining the patient's consent" [internal quotation marks omitted]). As a result, the written opinion letter requirement of § 52-190a does not apply to informed consent claims. *Shortell* v. *Cavanagh*, supra, 300 Conn. 385. The trial court, therefore, improperly dismissed count one due to the plaintiff's failure to append to her complaint a written opinion letter of a similar health care provider.

B

Negligent Infliction of Emotional Distress

We next consider the second count of the plaintiff's August 25, 2015 amended complaint. Titled "Negligent Infliction of Emotional Distress against Dr. Rutherford," it reiterates the allegation that, during the postoperative examination, the defendant "without any warning or notice [to] the plaintiff, forcefully inserted his fingers through the plaintiff's agglutinated labia and into her vagina." The count further alleges that "[t]he conduct of [the defendant] . . . created an unreasonable risk

of causing, and did in fact cause, the plaintiff emotional distress. The plaintiff's emotional distress was a foreseeable result of the conduct of [the defendant]. The emotional distress . . . was severe enough that it resulted in illness and may result in further illness or bodily harm. The conduct [of the defendant] was the cause of the plaintiff's distress."

As the plaintiff noted in her memorandum of law in opposition to the motion to dismiss, the negligent infliction of emotional distress claim set forth in count two "is not based upon or incident to a claim of medical negligence, but rather, is based upon her claim of battery against the defendant in count one." Although count two does not explicitly reference the term "consent," we are mindful that, in construing a particular cause of action, "[t]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded . . . ." (Internal quotation marks omitted.) *Perry* v. *Valerio*, 167 Conn. App. 734, 739–40, 143 A.3d 1202 (2016). Read broadly and realistically, count two plainly alleges that the plaintiff suffered emotional distress occasioned by the alleged battery perpetrated by the defendant, as detailed in the preceding count of the complaint. Both counts one and two claim that the defendant, without warning or notice to the plaintiff, digitally separated her agglutinated labia. The factual issues of whether warnings and notice were provided to the plaintiff, in turn, both pertain to the issue of informed consent. See, e.g., *Duffy* v. *Flagg*, 279 Conn. 682, 692, 905 A.2d 15 (2006) (physician must disclose, inter alia, nature of procedure and risks and hazards of procedure to patient "in order to obtain valid informed consent"); *Janusauskas* v. *Fichman*, 264 Conn. 796, 810, 826 A.2d 1066 (2003) (informed consent requires physician to provide patient with information that reasonable patient would have found material for making decision whether to embark upon contemplated course of treatment). We therefore agree with the plaintiff that both counts one and two advanced claims related to her general theory that there was a lack of informed consent to the defendant's conduct during the postoperative examination.

Like count one, count two contains no allegations that the defendant deviated from an applicable standard of care. It thus cannot properly be construed under our law as a claim of medical negligence. See *Dias* v. *Grady*, supra, 292 Conn. 359 ("the phrase 'medical negligence,' as used in § 52-190a (a), means breach of the standard of care"). As the trial judge aptly observed in an unrelated case, "[i]n a medical negligence claim, a treating physician must be found to have breached a standard of care applicable to the patient. . . . By contrast, a claim of negligent infliction of emotional distress need not necessarily involve a breach of the applicable standard of care by the treating physician. If the plaintiff's fear

or distress was reasonable, in light of the defendant's conduct, and the defendant should have realized that his conduct created an unreasonable risk of causing distress, there is a basis for liability." (Citations omitted.) *Brown* v. *Cusick*, Superior Court, judicial district of Fairfield, Docket No. CV-16-6060283-S (October 2, 2017); see also *Brown* v. *Njoku*, 170 Conn. App. 329, 331, 154 A.3d 587 (affirming judgment awarding plaintiff $35,000 in damages following court trial in action for, inter alia, battery and negligent infliction of emotional distress against physician who "inappropriately touched [her] buttocks and breasts"), cert. denied, 326 Conn. 901, 162 A.3d 724 (2017).

Because count two lacks any allegation that the defendant departed from the applicable standard of care, it cannot be deemed a claim of medical negligence subject to the requirements of § 52-190a. Rather, it more properly is construed as one derivative of the plaintiff's battery claim, for it concerns her general theory that the defendant lacked informed consent to digitally separate her agglutinated labia. For that reason, the court improperly granted the defendant's motion to dismiss due to noncompliance with § 52-190a.

II

Normally, our determination that a motion to dismiss was improperly granted would conclude our inquiry. In the present case, however, the court granted the motion to dismiss without prejudice to the plaintiff's pursuit of an action against the defendant for lack of informed consent. After filing a notice of intent to appeal from that dismissal; see footnote 7 of this opinion; the plaintiff then obtained permission from the court to file an amended pleading, on which the court ultimately rendered summary judgment in favor of the defendant. The plaintiff now challenges the propriety of that determination.

On appeal, the plaintiff claims that the court improperly concluded, as a matter of law, that she could not prevail in an informed consent action because the defendant's conduct in separating her agglutinated labia was not a separate procedure or course of treatment giving rise to a duty to obtain informed consent. She contends that a substantial change in circumstances occurred when the defendant discovered a complication during the postoperative examination that required medical intervention, which in turn obligated the defendant to obtain her informed consent before proceeding further. The parties agree that this issue is one of first impression in Connecticut. Accordingly, we first review the doctrine of informed consent to determine the proper legal standard by which to measure the plaintiff's claim. We then apply that standard to the facts before us, ever mindful of the procedural posture of this case.

A

The doctrine of informed consent traces its origins to the common-law notion that an adult "has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages." (Internal quotation marks omitted.) *Schmeltz* v. *Tracy*, supra, 119 Conn. 495–96, quoting *Schloendorff* v. *New York Hospital*, 211 N.Y. 125, 129–30, 105 N.E. 92 (1914) (Cardozo, J.), overruled on other grounds by *Bing* v. *Thunig*, 2 N.Y.2d 656, 143 N.E.2d 3, 163 N.Y.S.2d 3 (1957); see also *Union Pacific Railway Co.* v. *Botsford*, 141 U.S. 250, 251, 11 S. Ct. 1000, 35 L. Ed. 734 (1891) ("[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law"); *Abigail Alliance for Better Access to Developmental Drugs* v. *von Eschenbach*, 495 F.3d 695, 717 (D.C. Cir. 2007) (en banc) (courts have long "recognized with universal acquiescence that the free citizen's first and greatest right, which underlies all others, is the right to the inviolability of his person" [internal quotation marks omitted]), cert. denied, 552 U.S. 1159, 128 S. Ct. 1069, 169 L. Ed. 2d 839 (2008). As the United States Supreme Court has recognized, the "notion of bodily integrity [is] embodied in the requirement that informed consent is generally required for medical treatment." *Cruzan* v. *Director, Missouri Dept. of Health*, 497 U.S. 261, 269, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990).

The doctrine of informed consent attempts to balance the autonomy of the patient with the professional obligations of the physician.[13] In the seminal decision of *Canterbury* v. *Spence*, supra, 464 F.2d 780, the United States Court of Appeals for the District of Columbia Circuit explained that "[t]rue consent to what happens to one's self is the informed exercise of a choice, and that entails an opportunity to evaluate knowledgeably the options available and the risks attendant upon each. The average patient has little or no understanding of the medical arts, and ordinarily has only his physician to whom he can look for enlightenment with which to reach an intelligent decision. From these almost axiomatic considerations springs the need, and in turn the requirement, of a reasonable divulgence by physician to patient to make such a decision possible." (Footnotes omitted.) The court continued: "A physician is under a duty to treat his patient skillfully but proficiency in diagnosis and therapy is not the full measure of his responsibility. . . . [T]he physician is under an obligation to communicate specific information to the patient when the exigencies of reasonable care call for it. . . . The context in which the duty of risk-disclosure arises is invariably the occasion for decision as to whether a particular treatment procedure is to be undertaken. To

the physician, whose training enables a self-satisfying evaluation, the answer may seem clear, but it is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie. To enable the patient to chart his course understandably, some familiarity with the therapeutic alternatives and their hazards becomes essential." (Footnotes omitted.) Id., 781. For that reason, the court held that "the physician's overall obligation to the patient [includes the] duty of reasonable disclosure of the choices with respect to proposed therapy and the dangers inherently and potentially involved." Id., 782. Accordingly, a physician "must seek and secure his patient's consent before commencing an operation or other course of treatment."[14] Id.

The doctrine of informed consent "is embedded firmly in American jurisprudence, now forming a recognizable basis for physician liability in the [fifty] [s]tates and the District of Columbia." J. Merz, "On a Decision-Making Paradigm of Medical Informed Consent," 14 J. Legal Med. 231, 231 (1993). In Connecticut, "[i]nformed consent requires a physician to provide the patient with the information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy." (Internal quotation marks omitted.) *Janusauskas* v. *Fichman*, supra, 264 Conn. 810; accord *Canterbury* v. *Spence*, supra, 464 F.2d 787 ("[a] risk is . . . material when a reasonable person . . . would be likely to attach significance to the risk . . . in deciding whether or not to forego the proposed therapy" [internal quotation marks omitted]). As our Supreme Court held in *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 292, "the physician's disclosure should include: (1) the nature of the procedure, (2) the risks and hazards of the procedure, (3) the alternatives to the procedure, and (4) the anticipated benefits of the procedure." (Internal quotation marks omitted.)

At the same time, our Supreme Court has emphasized that the doctrine of informed consent "is a limited one" that requires "something less than a full disclosure of all information which may have some bearing, however remote, upon the patient's decision."[15] (Internal quotation marks omitted.) *Duffy* v. *Flagg*, supra, 279 Conn. 692–93; see also *Munn* v. *Hotchkiss School*, 326 Conn. 540, 605, 165 A.3d 1167 (2017) (*Espinosa, J.*, concurring) ("a physician need not disclose to patients every remote risk potentially associated with a medical procedure but only those deemed sufficiently likely as to be material"); *Pedersen* v. *Vahidy*, 209 Conn. 510, 523, 552 A.2d 419 (1989) (disclosure generally unnecessary when "the likelihood of such injury is remote"); *Precourt* v. *Frederick*, 395 Mass. 689, 694–95, 481 N.E.2d 1144 (1985) ("The materiality of information about a potential injury is a function not only of the severity of the injury, but also of the likelihood that it will occur.

Regardless of the severity of a potential injury, if the probability that the injury will occur is so small as to be practically nonexistent, then the possibility of that injury occurring cannot be considered a material factor in a rational assessment of whether to engage in the activity that exposes one to the potential injury."). Furthermore, "there is no need to disclose risks that are likely to be known by the average patient or that are in fact known to the patient usually because of a past experience with the procedure in question." (Internal quotation marks omitted.) *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 292. A physician nonetheless is obligated "to advise a patient of feasible alternatives"; id., 287; even when "some involve more hazard than others." Id., 295.

Under Connecticut law, application of the doctrine of informed consent is not confined to operations and surgical procedures. Rather, it concerns the physician's "duty to provide patients with material information concerning a proposed course of treatment." *Downs* v. *Trias*, 306 Conn. 81, 89, 49 A.3d 180 (2012); see also *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 292–93 (physician obligated to provide patient with information "material for making a decision whether to embark upon a contemplated course of therapy"). A contemplated course of therapy includes—but is not limited to—a particular procedure, operation, or surgery. See *Torres* v. *Carrese*, supra, 149 Conn. App. 622.[16] For example, in *Curran* v. *Kroll*, 303 Conn. 845, 859–60, 37 A.3d 700 (2012), the patient sought medical treatment for menopausal issues. Our Supreme Court held that the failure of the defendant physician to advise the patient of "any symptoms and risks associated" with the birth control medication that the physician had prescribed gave rise to "a cause of action for lack of informed consent." Id., 858; see also *Johnson* v. *Rheumatology Associates, P.C.*, Superior Court, judicial district of Hartford, Docket No. CV-12-6031500-S (December 29, 2014) (59 Conn. L. Rptr. 549, 550) ("[o]bviously treatment of a condition by the prescribing of medication is no less a form of treatment than surgery for a condition"). Our Supreme Court likewise has held that the nonsurgical procedure of obtaining a blood transfusion constituted a course of therapy and, thus, properly could give rise to a cause of action for lack of informed consent. *Sherwood* v. *Danbury Hospital*, supra, 278 Conn. 180–82. Accordingly, the doctrine of informed consent applies to a course of medical treatment undertaken by a patient in consultation with a medical practitioner.

1

In the present case, the parties do not dispute that the defendant obtained the informed consent of the plaintiff to perform the laser ablation of her vulva on April 25, 2014. Indeed, her consent was memorialized on

the signed consent form. The plaintiff further concedes that she consented, as part of that course of treatment, to the May 14, 2014 postoperative examination.[17] The plaintiff nonetheless argues that a substantial and material change in circumstances occurred when the defendant discovered the labial agglutination, which obligated the defendant to obtain her informed consent before embarking on a course of treatment therefor.[18] That claim presents an issue of first impression in this state. For his part, the defendant in his appellate brief acknowledges that a "new informed consent" may be required when "a substantial and material change in circumstances" arises during a course of treatment.

The "determination of the proper legal standard in any given case is a question of law subject to our plenary review." (Internal quotation marks omitted.) *Mirjavadi* v. *Vakilzadeh*, 310 Conn. 176, 183, 74 A.3d 1278 (2013). In light of the rationale underlying the doctrine of informed consent, as well as persuasive out-of-state authority, we agree with the parties that, when a substantial and material change in circumstances occurs during the course of medical treatment, a duty may arise on the part of the physician to secure the consent of the patient before proceeding further.

The doctrine of informed consent is rooted in the recognition of a patient's right to bodily autonomy. See *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 288 ("[w]e have approved the principle that [e]very human being of adult years and sound mind has a right to determine what shall be done with his own body" [internal quotation marks omitted]). The doctrine further is premised on the precept that "[t]rue consent to what happens to one's self is the informed exercise of a choice, and that entails an opportunity to evaluate knowledgeably the options available and the risks attendant upon each." *Canterbury* v. *Spence*, supra, 464 F.2d 780; see also *Logan* v. *Greenwich Hospital Assn.*, supra, 295 (physician obligated to advise patient of "all viable alternatives . . . even though some involve more hazard than others"). Accordingly, a physician is required to provide the patient with that information which a reasonable person would deem material in deciding whether to embark upon a particular course of treatment.[19] *Sherwood* v. *Danbury Hospital*, supra, 278 Conn. 180.

Significantly, our decisions on the doctrine of informed consent do not limit that duty to the actual date that a particular procedure is performed or medical service is rendered. Rather, Connecticut law consistently has delineated that duty as one that applies to a "course of treatment"; see, e.g., *Downs* v. *Trias*, supra, 306 Conn. 89; or a "course of therapy" undertaken by a patient. See *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 293. While a physician's treatment of a patient sometimes begins and ends in a matter of

hours or days, a course of treatment often transpires over a much longer period. See, e.g., *Curran* v. *Kroll*, supra, 303 Conn. 848 (medical treatment of patient occurred over span of "approximately one month before her death" [internal quotation marks omitted]); *Tetreault* v. *Eslick*, 271 Conn. 466, 469, 857 A.2d 888 (2004) (physician "planned to continue [the] course of treatment for a period of at least six months").

As the Supreme Court of Wisconsin has observed, a patient's consent to treatment is not "categorically immutable" once it has been given to a physician. *Schreiber* v. *Physicians Ins. Co. of Wisconsin*, 223 Wis. 2d 417, 429, 588 N.W.2d 26, cert. denied, 528 U.S. 869, 120 S. Ct. 169, 145 L. Ed. 2d 143 (1999). When a substantial change of circumstances occurs during the course of medical treatment, it "results in an alteration of the universe of options a patient has and alters the agreed upon course of navigation through that universe."[20] Id., 432. Although a patient previously may have provided informed consent to a particular course of treatment, the Supreme Court of Wisconsin "decline[d] to view the informed consent discussion as a solitary and blanketing event, a point on a timeline after which such discussions are no longer needed because they are 'covered' by some articulable occurrence in the past. Rather, a substantial change in circumstances . . . requires a new informed consent discussion. . . . To conclude otherwise would allow a solitary informed consent discussion to immunize a physician for any and all subsequent treatment of that patient." (Citation omitted.) Id., 433–34. The court, thus, concluded that, when a substantial change in circumstances arises, the physician has "a duty to conduct another informed consent discussion and [provide the patient with] her treatment options and . . . the opportunity to choose."[21] Id., 434. The Supreme Court of Colorado likewise has recognized that, when a "previously undisclosed, and substantial risk arises," a physician may have a "duty [to obtain informed consent that is] based on changed circumstances." *Gorab* v. *Zook*, 943 P.2d 423, 430 (Colo. 1997) (en banc).

We find that authority highly persuasive, particularly in light of the underpinnings of the doctrine of informed consent. When consent is provided by a patient in a given case, its scope necessarily is limited to the course of treatment outlined by the medical practitioner, and encompasses only those risks, hazards, alternatives, and anticipated benefits then disclosed. For that reason, when a truly substantial change arises during the course of treatment that meets the standard of materiality under our law,[22] we agree that the medical practitioner generally is obligated to obtain consent from the patient before proceeding further. To conclude otherwise would contravene the fundamental purpose of the doctrine of informed consent.

At the same time, the circumstances in which substantial changes arise do not always lend themselves to such a dialogue between patient and physician. For that reason, a physician's duty to secure informed consent is not an absolute one, but rather is contingent on the particular context in which it arises. To accommodate the exigencies inherent in the practice of medicine, courts have crafted exceptions to the physician's general duty that excuse the failure to obtain such consent in certain circumstances.[23] See generally A. Meisel, "The 'Exceptions' to the Informed Consent Doctrine: Striking a Balance Between Competing Values in Medical Decisionmaking," 1979 Wis. L. Rev. 413 (1979). As the Supreme Court of Iowa recently observed, "a number of situations may be established by the defendant physician as a defense to an informed consent action, constituting exceptions to the duty to disclo[se]. These include: (1) Situations in which complete and candid disclosure might have a detrimental effect on the physical or psychological well-being of the patient;[24] (2) Situations in which a patient is incapable of giving consent by reason of mental disability or infancy; (3) Situations in which an emergency makes it impractical to obtain consent; (4) Situations in which the risk is either known to the patient or is so obvious as to justify a presumption on the part of the physician that the patient has knowledge of the risk; (5) Situations in which the procedure itself is simple and the danger remote and commonly appreciated to be remote; (6) Situations in which the physician does not know of an otherwise material risk and should not have been aware of it in the exercise of ordinary care."[25] (Footnote added; internal quotation marks omitted.) *Andersen* v. *Khanna*, 913 N.W.2d 526, 537 n.4 (Iowa 2018); see also *Holt* v. *Nelson*, 11 Wn. App. 230, 240–41, 523 P.2d 211 (1974) (enumerating various exceptions).

The emergency exception has been recognized by courts across the country. See *Shine* v. *Vega*, 429 Mass. 456, 464, 709 N.E.2d 58 (1999) ("[t]he emergency exception to the informed consent doctrine has been widely recognized"); *Miller* v. *Rhode Island Hospital*, 625 A.2d 778, 784 (R.I. 1993) ("[e]qually as well established as the informed consent doctrine is the exception to it for emergencies"). As the court in *Canterbury* explained, the emergency exception "comes into play when the patient is unconscious or otherwise incapable of consenting, and harm from a failure to treat is imminent and outweighs any harm threatened by the proposed treatment. When a genuine emergency of that sort arises, it is settled that the impracticality of conferring with the patient dispenses with need for it." *Canterbury* v. *Spence*, supra, 464 F.2d 788–89. Put simply, "a physician is not required to obtain the patient's consent in an emergency situation where the patient is in immediate

danger." *Wheeldon* v. *Madison*, 374 N.W.2d 367, 375 (S.D. 1985). Although our appellate courts have not had occasion to circumscribe the precise parameters of the emergency exception, it applies under our state regulations to medical treatment performed in hospitals throughout Connecticut. See Regs., Conn. State Agencies § 19-13-D3 (d) (8);[26] cf. *In re Cassandra C.*, 316 Conn. 476, 496–97, 112 A.3d 158 (2015) ("[A]t common law, minors generally were considered to lack the legal capacity to give valid consent to medical treatment or services, and consequently a parent, guardian, or other legally authorized person generally was required to provide the requisite consent. *In the absence of an emergency*, a physician who provided medical care to a minor without such parental or other legally authorized consent could be sued for battery." [Emphasis added; internal quotation marks omitted.]); *Ranciato* v. *Schwartz*, Superior Court, judicial district of New Haven, Docket No. CV-11-6023107-S (November 26, 2014) ("in the absence of an emergency a healthcare provider must offer pertinent information to his or her patients" [internal quotation marks omitted]).

Courts also have recognized that a physician's alleged failure to secure informed consent properly is excused by the existence of a valid waiver on the part of the patient. See, e.g., *Arato* v. *Avedon*, 5 Cal. 4th 1172, 1189, 858 P.2d 598, 23 Cal. Rptr. 2d 131 (1993) (en banc) ("a patient may validly waive the right to be informed"); *Spar* v. *Cha*, 907 N.E.2d 974, 983 (Ind. 2009) ("[m]any jurisdictions recognize either by judicial ruling or statute that a patient may waive her right to informed consent"); cf. Utah Code Ann. § 78B-3-406 (3) (2012).[27] For that reason, "[w]hen a patient consents to surgery, acknowledges he or she understands complications may arise, and authorizes the doctor to remedy these complications, it follows that the patient has consented to treatment of those complications whether they occur in the operating room or afterward in the recovery room." *Hageny* v. *Bodensteiner*, 316 Wis. 2d 240, 250–51, 762 N.W.2d 452 (App. 2008); see also *Cobbs* v. *Grant*, 8 Cal. 3d 229, 245, 502 P.2d 1, 104 Cal. Rptr. 505 (1972) (en banc) ("a medical doctor need not make disclosure of risks when the patient requests that he not be so informed"); *Holt* v. *Nelson*, supra, 11 Wn. App. 241 ("[a] physician need not disclose the hazards of treatment when the patient has requested she not be told about the dangers"). The patient's ability to relieve a physician of the duty to obtain informed consent during the course of medical treatment is consistent with, and in furtherance of, the right to bodily autonomy. As one commentator aptly noted, "[a] properly obtained waiver is completely in keeping with the values sought to be promoted by informed consent. The patient remains the ultimate decisionmaker, but the content of his decision is shifted from the decisional level to the metadecisional level—from the equivalent of 'I want this

treatment . . .' to . . . 'I don't want to decide; you make the decision as to what should be done.' Waiver thus permits the patient to be treated without participating in the medical decisionmaking process, or at least without fully participating." (Footnote omitted.) A. Meisel, supra, 1979 Wis. L. Rev. 459.

In *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 292, our Supreme Court acknowledged an additional exception, noting that "there is no need to disclose risks that are likely to be known by the average patient or that are in fact known to the patient usually because of a past experience with the procedure in question." (Internal quotation marks omitted.) See also *Ranciato* v. *Schwartz*, supra, Superior Court, Docket No. CV-11-6023107-S (plaintiff could not prevail on informed consent claim when "she knew of [the] risk due to past experience"); *Crain* v. *Allison*, 443 A.2d 558, 562 (D.C. 1982) ("a physician need not advise concerning risks of which the patient already has actual knowledge"); *Spar* v. *Cha*, supra, 907 N.E.2d 984 (physician need not advise of risks known to patient because of past experience with procedure); *Sard* v. *Hardy*, 281 Md. 432, 445, 379 A.2d 1014 (1977) ("disclosure is not required where the risk is . . . known to the patient"); *Scaria* v. *St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 12–13, 227 N.W.2d 647 (1975) (physician "should not be required to discuss risks that are apparent or known to the patient"). The rationale for that exception is that the patient who is aware of the risks that accompany a particular procedure or course of treatment already is an informed patient.

Application of the doctrine of informed consent, therefore, involves more than simply an examination of the communications, or lack thereof, between physician and patient. It also requires consideration of the context in which the physician's duty arose. That context is crucial to the determination of whether an exception to that duty is implicated. Moreover, in an action predicated on an alleged lack of informed consent, "[t]he burden of proving an exception to [the] duty" rests with the physician. *Scott* v. *Bradford*, 606 P.2d 554, 558 (Okla. 1979); see also *Canterbury* v. *Spence*, supra, 464 F.2d 791 ("[t]he burden of going forward with evidence pertaining to a privilege not to disclose . . . rests properly upon the physician" [footnote omitted]); *Cobbs* v. *Grant*, supra, 8 Cal. 3d 245 (physician bears "the burden of [proving] justification for failure to disclose"); *Shine* v. *Vega*, supra, 429 Mass. 462 ("the [defendant physician and hospital] had the burden of proving that an exception relieved them of tort liability").

3

Accordingly, we conclude that, when a substantial and material alteration of the risks, anticipated benefits, or alternatives previously disclosed to the patient occurs during a course of medical treatment, the doc-

trine of informed consent generally requires an additional informed consent discussion between physician and patient. When, however, the context of such alteration implicates an exception to the duty to disclose, the law relieves the physician of that obligation. With that analytical framework in mind, we return our attention to the present case.

### B

In her revised complaint, the plaintiff alleges a cause of action for lack of informed consent. Distilled to its essence, her claim is that, upon discovering a complication that required medical intervention, the defendant unilaterally proceeded with a course of treatment without obtaining her informed consent. The court subsequently rendered summary judgment in favor of the defendant, concluding that the defendant's conduct in separating the plaintiff's agglutinated labia was not a separate procedure or course of treatment giving rise to a duty to obtain informed consent, but rather "was part of another examination for which the [defendant] received the written consent of the plaintiff." On appeal, the plaintiff challenges the propriety of that determination.

Summary judgment is appropriate when "the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49; *Miller* v. *United Technologies Corp.*, 233 Conn. 732, 744–45, 660 A.2d 810 (1995). A material fact is one "that will make a difference in the result of the case." (Internal quotation marks omitted.) *Straw Pond Associates, LLC* v. *Fitzpatrick, Mariano & Santos, P.C.*, 167 Conn. App. 691, 728, 145 A.3d 292, cert. denied, 323 Conn. 930, 150 A.3d 231 (2016). "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual

issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45]. . . . Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Todd* v. *Nationwide Mutual Ins. Co.*, 121 Conn. App. 597, 601–602, 999 A.2d 761, cert. denied, 297 Conn. 929, 998 A.2d 1196 (2010).

The following additional facts, as gleaned from the pleadings, affidavits, and other proof submitted when viewed in a light most favorable to the plaintiff; *Martinelli* v. *Fusi*, 290 Conn. 347, 350, 963 A.2d 640 (2009); are relevant to the plaintiff's claim. We begin by noting what is not in dispute. Years prior to the medical treatment at issue in this appeal, the defendant performed a laser ablation of the plaintiff's vulva to remove precancerous growths. Prior to performing that procedure on August 25, 2011, the defendant discussed the procedure with the plaintiff and she signed a consent form so indicating. After the procedure concluded, the plaintiff was provided lidocaine gel as a preventative measure to avoid labial agglutination.[28] The defendant at that time cautioned the plaintiff that "she should quit smoking or else she would end up needing the procedure again." Weeks later, the defendant conducted a postoperative examination of the surgical site to ensure that it was healing properly. No complications were discovered during that examination.

When precancerous growths later returned, the plaintiff again consulted with the defendant. The defendant discussed the laser ablation treatment with the plaintiff, who then signed a standardized consent form. That form stated in relevant part that the defendant "has explained to me in a way that I understand: (a) the nature and purpose of the procedure(s); (b) the potential benefits and risks of the procedure(s) including bleeding, infection, accidental injury of other body parts, failure to permanently improve my condition or, death, as well as the potential risks and benefits of the medications that may be administered to me as part of the procedure; and (c) the alternative(s) to the procedure(s) and their potential risks and benefits, including the option of not having the procedure." The consent form also authorized the defendant "to do whatever may be necessary if there is a complication or unforeseen condition during my procedure."

The defendant performed a second laser ablation to remove precancerous growths on the plaintiff's vulva on April 25, 2014. When that procedure concluded, the plaintiff again was provided with lidocaine gel and was advised to schedule a postoperative examination "so that [the defendant] could examine the surgical site and

make sure that it was healing properly." The defendant conducted that examination approximately three weeks later, on May 14, 2014. Four individuals were present at that examination: the plaintiff, the defendant, Andersen, and an unidentified nurse. It is undisputed that the plaintiff consented to the postoperative examination. See footnote 17 of this opinion.

After arriving at the Yale University Gynecologic Center, the plaintiff undressed and placed her legs in stirrups. The defendant began his examination with a visual inspection of the plaintiff and then informed her that "everything looked fine." The parties disagree as to precisely what happened next.

In her operative complaint, the plaintiff alleged that the defendant discovered the labial agglutination "during" the postoperative examination; the defendant admitted the truth of that allegation in his answer. The plaintiff further alleged that the defendant at that time embarked on a course of treatment for that complication without first obtaining her informed consent. More specifically, the plaintiff alleged that the defendant "forcefully inserted his fingers through [her] agglutinated labia" without informing her of "the nature of the procedure," its "risks and hazards," its "anticipated benefits," and "any alternatives [when] other procedures were available . . . ."

In his November 4, 2016 affidavit, the defendant described what transpired during the postoperative examination as follows: "I informed [the plaintiff] that I was going to examine her vagina. . . . In order to observe the surgical site, I had to separate [her] labia. As I did so, she yelped in pain. At that moment, I realized that her labia had become agglutinated. I apologized for causing her pain, and I continued with the examination. . . . Agglutination, which is the partial fusing of skin, can occur after laser ablation surgery. It occurs at the surgical site, which in [the plaintiff's] case, was on the interior of her labia. Because of that location, there was no way for me to know if [her] labia were agglutinated before trying to separate them to examine the surgical site." He continued: "If labia are agglutinated two weeks after laser surgery, they must be separated. Generally, the agglutination at that point is mild, and it can be done in a split-second using a finger. This is the least intrusive and most effective way of separating agglutinated labia." In his August 17, 2016 response to the plaintiff's first set of interrogatories, the defendant stated that although "[m]ore severely agglutinated labia may require a surgical procedure," the plaintiff's labia were not agglutinated "to the degree that . . . require[d] treatment or procedure." The defendant also acknowledged that, "[a]fter discovering that [the plaintiff's] labia were agglutinated during the examination, I discussed with her that her labia had agglutinated as a result of her laser ablation surgery.

. . . I informed her that she had agglutinated labia that required separation. I told her I was sorry that I hurt her by separating her agglutinated labia." As he did in his affidavit, the defendant stated in his response to interrogatories that he "did not know that [the plaintiff's] labia were agglutinated until [he] separated them to perform [the] postoperative examination."

In opposing the motion for summary judgment, the plaintiff provided a different account of those events. In her sworn affidavit, she stated: "[W]hen the defendant entered the room, he said that he was going to take a look at me, and further stated that everything looked fine. . . . Then, without warning, [he] forcefully inserted his fingers into my vagina, separating an agglutination . . . of my labia, which caused me severe pain. . . . I cried out in pain as a result of the defendant inserting his fingers through the agglutination, and [he] expressed his concern that I may pass out as a result. . . . The defendant stated that he performed this procedure so that I would not have to go to the operating room for surgery." The plaintiff further stated that the defendant provided "no warning or notice to [her] . . . at any time before" he remedied the labial agglutination. In her affidavit, Andersen likewise averred that the defendant "expressed concern that the plaintiff may pass out as a result of the separation of her agglutinated labia" and then "stated that he performed [the] procedure so that the plaintiff would not have to go to the operating room for surgery."

Although the defendant claims that he "did not know that [the plaintiff's] labia were agglutinated until [he] separated them," the affidavits of the plaintiff and Andersen, read in the light most favorable to the plaintiff as the nonmoving party; see *Brooks* v. *Powers*, 328 Conn. 256, 259, 178 A.3d 366 (2018); suggest otherwise. Those affidavits allege that the defendant, after separating her agglutinated labia, informed them that he "performed [the] procedure *so that the plaintiff would not have to go to the operating room for surgery*."[29] (Emphasis added.) Viewed in a manner most favorable to the plaintiff, the finder of fact could construe that purported statement, in light of the defendant's admission that "severely agglutinated labia may require a surgical procedure" and the significant pain experienced by the plaintiff,[30] as an admission that the defendant was aware of two viable alternative treatments at the time that he discovered the medical complication. See *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 295 ("all viable alternatives [must] be disclosed even though some involve more hazard than others").[31] If the finder of fact were to credit those affirmations, it reasonably could conclude that the defendant discovered the complication during his initial examination of the plaintiff and then, without her informed consent, made a unilateral decision to pursue a particular course of treatment—digital separation—when another viable alter-

native existed.[32]

In light of the foregoing, we conclude that a genuine issue of material fact exists as to whether the discovery of the medical complication during the postoperative examination constituted a substantial and material change in circumstances, such that the defendant was obligated to disclose the risks, anticipated benefits, and viable alternatives to the plaintiff before embarking on a course of treatment therefor.

That determination does not end our inquiry, as a physician's failure to obtain informed consent may be excused in certain circumstances, such as when the patient has authorized the physician to remedy complications that arise during a course of medical treatment. See, e.g., *Hageny* v. *Bodensteiner*, supra, 316 Wis. 2d 250–51. In rendering summary judgment, the court concluded that the materials submitted in connection with the motion for summary judgment demonstrated that the defendant's conduct in remedying the labial agglutination was treatment "for which [the defendant] received the written consent of the plaintiff." We disagree.

It is undisputed that, in the spring of 2014, the plaintiff, in consultation with the defendant, embarked on a course of treatment for precancerous growths on her vulva. That course of treatment included both the laser ablation procedure that the defendant performed on April 25, 2014, and the postoperative examination on May 14, 2014.

The plaintiff's informed consent is memorialized on the consent form, a copy of which was submitted as an exhibit to the defendant's reply to the plaintiff's objection to the motion for summary judgment. That written consent came on a standardized form titled "Yale-New Haven Hospital Consent for Operation or Special Procedure." The form provides in relevant part: "After discussing other options, including no treatment, with [the defendant], I give [the defendant] permission to perform the following surgery, procedure(s) or treatment . . . $CO_2$ Laser Ablation of Vulva." The consent form further stated: "I give permission to [the defendant] to do whatever may be necessary if there is a complication or unforeseen condition *during my procedure*." (Emphasis added.)

Undoubtedly, that signed consent vested the defendant with discretion to deal with any complications or unforeseen conditions that arose during the laser ablation procedure performed on April 25, 2014. That consent form nevertheless is silent as to postoperative care. It confirms only that the plaintiff had discussed the $CO_2$ laser ablation procedure and "other options" with the defendant. The consent form contains no indication that the parties discussed the possibility of labial agglutination or various medical treatments for that

complication. Indeed, in his November 4, 2016 affidavit, the defendant attested that, as a matter of practice, he does "not warn patients that their labia might be agglutinated because most do not have agglutinated labia."

Furthermore, paragraph 3 of the standardized consent form begins by stating: "My responsible practitioner has explained to me in a way that I understand: (a) the nature and purpose of the procedure(s); (b) the potential benefits and risks of the procedure(s) including bleeding, infection, accidental injury of other body parts, failure to permanently improve my condition or, death, as well as the potential risks and benefits of the medications that may be administered to me as part of the procedure; and (c) the alternative(s) to the procedure(s) and their potential risks and benefits, including the option of not having the procedure." It then states: "I understand that some possible complications of the procedure(s) include" followed by several blank lines. That part of the consent form was left blank, with no possible complications identified.

Read literally, and in the light most favorable to the plaintiff as the nonmoving party, the consent form authorized the defendant "to do whatever may be necessary" only with respect to unforeseen complications that arose during the April 25, 2014 laser ablation procedure. The defendant has provided no evidence, such as affidavit testimony indicating otherwise. Accordingly, we conclude that a genuine issue of material fact exists as to whether the plaintiff had authorized the defendant to remedy unforeseen complications that arose not during the April 25, 2014 laser ablation procedure, but during the postoperative examination weeks later.

III

In sum, we conclude that the court improperly granted the defendant's motion to dismiss the battery and negligent infliction of emotional distress counts of the August 25, 2015 amended complaint due to noncompliance with § 52-190a. We further conclude that the court improperly rendered summary judgment in favor of the defendant on the plaintiff's February 8, 2016 revised complaint, as genuine issues of material fact exist regarding the defendant's discovery of a medical complication during the postoperative examination. The matter, therefore, must be remanded to the trial court for further proceedings.

The judgment is reversed and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.

[1] The operative complaints in the present case also named Yale University as a defendant and alleged negligent supervision on its part. The trial court subsequently granted Yale University's motion to dismiss that claim, and the plaintiff has not appealed from that judgment. Furthermore, Yale University is not a party to this appeal. We therefore refer to Thomas J. Rutherford, M.D., as the defendant in this opinion.

[2] Ablation is the "[r]emoval of a body part or the destruction of its function, as by a surgical procedure, morbid process, or noxious substance." Stedman's Medical Dictionary (27th Ed. 2000) p. 3.

[3] Agglutination is the "[a]dhesion of the surfaces of a wound." Stedman's Medical Dictionary (27th Ed. 2000) p. 35; see also Webster's Third New International Dictionary (2002) p. 41 (defining "agglutinate" as "joined with or as if with glue").

[4] General Statutes § 52-190a provides in relevant part: "(a) No civil action or apportionment complaint shall be filed to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, whether in tort or in contract, in which it is alleged that such injury or death resulted from the negligence of a health care provider, unless the attorney or party filing the action or apportionment complaint has made a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. The complaint, initial pleading or apportionment complaint shall contain a certificate of the attorney or party filing the action or apportionment complaint that such reasonable inquiry gave rise to a good faith belief that grounds exist for an action against each named defendant or for an apportionment complaint against each named apportionment defendant. To show the existence of such good faith, the claimant or the claimant's attorney, and any apportionment complainant or the apportionment complainant's attorney, shall obtain a written and signed opinion of a similar health care provider, as defined in section 52-184c, which similar health care provider shall be selected pursuant to the provisions of said section, that there appears to be evidence of medical negligence and includes a detailed basis for the formation of such opinion. . . .

"(c) The failure to obtain and file the written opinion required by subsection (a) of this section shall be grounds for the dismissal of the action."

[5] The plaintiff's counsel stated that the plaintiff "consented to [the defendant] examining her vagina. . . . [W]hat she didn't consent to was his jamming his fingers into her vagina forcibly to separate something, and she [had] no knowledge of that procedure, she didn't know that was going to happen, and she . . . didn't consent to that. . . . [S]he will testify that had she known that [her labia were agglutinated], she would have asked for more clarification of what the process was going to entail, whether she could get some sort of pain medication. She had no idea—she consented only to being examined, not to having the [defendant], without any warning, jam his fingers into her vagina. . . . [T]hat's why we [pleaded] it as a battery. There's no consent to what he did to her."

[6] "The classification of a negligence claim as either medical malpractice or ordinary negligence requires a court to review closely the circumstances under which the alleged negligence occurred. [P]rofessional negligence or malpractice . . . [is] defined as the *failure of one rendering professional services* to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services. . . . Furthermore, malpractice presupposes some *improper conduct in the treatment or operative skill* [or] . . . the failure to exercise requisite medical skill . . . . From those definitions, we conclude that the relevant considerations in determining whether a claim sounds in medical malpractice are whether (1) the defendants are sued in their capacities as medical professionals, (2) the alleged negligence is of a specialized medical nature that arises out of the medical professional-patient relationship, and (3) the alleged negligence is substantially related to medical diagnosis or treatment and involved the exercise of medical judgment." (Emphasis in original; internal quotation marks omitted.) *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 562–63, 864 A.2d 1 (2005).

[7] On November 9, 2015, the plaintiff filed a notice of intent to appeal the ruling of the court granting the motion to dismiss, in which the plaintiff stated that she "seeks to defer the taking of an appeal until a final judgment that disposes of this case for all purposes and as to all parties is rendered." The defendant did not object to that notice and has raised no claim with respect thereto in this appeal.

[8] To be clear, the plaintiff in the present case does not allege that labial agglutination was a material risk of the laser ablation procedure that the defendant had a duty to disclose prior to performing that procedure, nor has she furnished any affidavits or other proof that would support such a contention. The only evidence in the record before us regarding the risk of labial agglutination is the defendant's uncontroverted statement in his

November 4, 2016 affidavit indicating that labial agglutination is a rare complication of the laser ablation procedure. See *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 291, 465 A.2d 294 (1983) (duty of informed consent does not require disclosure of "all information which may have some bearing, however remote, upon the patient's decision"); see also *Munn* v. *Hotchkiss School*, 326 Conn. 540, 605, 165 A.3d 1167 (2017) (*Espinosa, J.*, concurring) ("a physician need not disclose to patients every remote risk potentially associated with a medical procedure but only those deemed sufficiently likely as to be material"); *Pedersen* v. *Vahidy*, 209 Conn. 510, 523, 552 A.2d 419 (1989) (disclosure generally unnecessary when "the likelihood of such injury is remote"). For that reason, the defendant emphasizes in his appellate brief that the plaintiff "has never alleged, let alone offered evidence, that agglutination is a 'known material risk' of $CO_2$ laser ablation of the vulva such that [the defendant] had a specific duty to warn her about it before she consented to the original procedure. . . . [I]t has never been the plaintiff's claim that [the defendant] failed to obtain her informed consent to the laser ablation procedure." On appeal, the plaintiff does not disagree with that statement. Rather, her claim is altogether a different one—namely, that the defendant, after discovering the labial agglutination during the postoperative examination, embarked on a course of treatment to remedy that complication without her consent.

[9] In her principal appellate brief, the plaintiff briefly notes her objection to the inclusion of her signed consent form as an exhibit to the defendant's reply brief. Nonetheless, she raised no objection to that exhibit before the trial court, either in written form or during the February 6, 2017 hearing on the motion for summary judgment, rendering that evidentiary objection unpreserved.

[10] At oral argument on the motion for summary judgment, the defendant's counsel conceded that "going into an operating room, of course," constitutes "a separate course of therapy" for which a medical practitioner must obtain "a separate consent" from the patient.

[11] We emphasize that the question before us in part I of this opinion is a narrow one regarding the applicability of § 52-190a, and not whether the plaintiff's battery and negligent infliction of emotional distress counts, as pleaded, could survive a motion to strike or a motion for summary judgment.

[12] For that reason, the three part test for ascertaining whether a negligence claim properly is classified as one sounding in medical negligence; see footnote 6 of this opinion; is inapposite. The defendant's reliance on *Votre* v. *County Obstetrics & Gynecology Group, P.C.*, 113 Conn. App. 569, 585, 966 A.2d 813, cert. denied, 292 Conn. 911, 973 A.2d 661 (2009), likewise is misplaced. Unlike the present case, the plaintiff's complaint in *Votre* "included factual allegations that implicated deviation from professional medical standards," a distinction that this court expressly deemed to be significant. Id., 574. The court in *Votre* further emphasized that "[a]lthough the plaintiff here denominated the claims in her complaint as sounding in ordinary tort and breach of contract, the factual allegations underlying the claims require proof of the defendants' deviation from the applicable standard of care of a health care provider . . . ." Id., 580. That is not the case when a cause of action is predicated on a lack of informed consent. *Shortell* v. *Cavanagh*, 300 Conn. 383, 390–91, 15 A.3d 1042 (2011).

[13] As one court succinctly put it, "[t]he doctor's primary duty is to do what is best for the patient." *Watson* v. *Clutts*, 262 N.C. 153, 159, 136 S.E.2d 617 (1964). For a discussion of the tension that arises when principles of patient autonomy and physician beneficence collide, see P. Walter, "The Doctrine of Informed Consent: To Inform or Not to Inform," 71 St. John's L. Rev. 543 (1997).

[14] In *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 290–93, the seminal Connecticut decision on the doctrine of informed consent, our Supreme Court expressly adopted the reasoning of *Canterbury* in holding that a lay standard of disclosure governs informed consent claims in Connecticut. See also *Downs* v. *Trias*, 306 Conn. 81, 88–89 n.5, 49 A.3d 180 (2012).

[15] As the Supreme Court of Idaho has observed, "it would be impossible for a healthcare provider to fully apprise his or her patients of every aspect of each procedure. The human body is amazingly complex, and to fully comprehend even the most mundane treatment one must have an advanced understanding of anatomy and physiology. Without some limit on the amount of information that a healthcare provider is obligated to discuss, our healthcare infrastructure would grind to a halt." *Peckham* v. *Idaho State Board of Dentistry*, 154 Idaho 846, 853, 303 P.3d 205 (2013).

[16] In *Torres*, this court noted that "[o]ur case law regarding the issue of

a physician's obligation to obtain a patient's informed consent focuses on the decision to embark upon a contemplated course of therapy, *such as* a procedure, operation, or surgery." (Emphasis added; internal quotation marks omitted.) *Torres* v. *Carrese*, supra, 149 Conn. App. 622. In *Torres*, the court concluded that a physician who provided prenatal care to a patient, but was not the surgeon who subsequently performed a cesarean section, had no duty to apprise her of the risks involved in that surgical procedure. As the court explained, "[u]nder our law . . . a physician's obligation to obtain informed consent turns on the performance of a procedure and *not* the intent to perform a procedure." (Emphasis in original.) Id., 623. "Because the procedure was to be performed in the future and [the physician who provided prenatal care] was never in the position to be the operating surgeon, [that physician] had no obligation to obtain informed consent." Id., 623 n.30. By contrast, the defendant in the present case performed both the laser ablation procedure on April 25, 2014, and the postoperative examination of the plaintiff on May 14, 2014.

[17] At the October 19, 2015 hearing on the defendant's motion to dismiss, the plaintiff's counsel acknowledged that the plaintiff had consented to the postoperative examination. The plaintiff's counsel likewise confirmed at oral argument before this court that the plaintiff was "not contesting [that she consented to] the postoperative examination."

[18] We reiterate that the plaintiff has not claimed, at any stage of the proceedings, that labial agglutination was a likely and, hence, material risk that the defendant had a duty to disclose *prior* to performing the laser ablation procedure. See footnote 8 of this opinion. Rather, her claim is that, when that remote risk subsequently materialized, the defendant was obligated to apprise her of all viable treatment alternatives and their attendant risks and benefits before proceeding further.

[19] That duty obligates a physician to disclose "(1) the nature of the procedure, (2) the risks and hazards of the procedure, (3) the alternatives to the procedure, and (4) the anticipated benefits of the procedure." (Internal quotation marks omitted.) *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 292.

[20] As in Connecticut, the duty of informed consent under Wisconsin law is measured by a materiality standard, for which "the touchstone [is whether a] reasonable person in the position of the patient would want to know" of a given risk, benefit, or alternative to a particular course of treatment. *Schreiber* v. *Physicians Ins. Co. of Wisconsin*, supra, 223 Wis. 2d 427; accord *Janusauskas* v. *Fichman*, supra, 264 Conn. 810 (informed consent requires physician to provide patient with information that reasonable patient would have found material for making decision whether to embark upon contemplated course of treatment). In *Schreiber*, the court noted that a substantial change in circumstances involves a material alteration of the risks, benefits, or alternatives that accompany a particular treatment. *Schreiber* v. *Physicians Ins. Co. of Wisconsin*, supra, 428–32.

[21] That conclusion comports with the precept that "[t]he context in which the [physician's] duty [to disclose] arises is invariably the occasion for decision as to whether a particular treatment procedure is to be undertaken." *Canterbury* v. *Spence*, supra, 464 F.2d 781.

[22] "Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment." (Internal quotation marks omitted.) *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 291. Under Connecticut law, a physician is obligated "to provide the patient with that information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy." Id., 292–93; see also *Duffy* v. *Flagg*, supra, 279 Conn. 691; *Janusauskas* v. *Fichman*, supra, 264 Conn. 810; *DeGennaro* v. *Tandon*, 89 Conn. App. 183, 190, 873 A.2d 191, cert. denied, 274 Conn. 914, 879 A.2d 892 (2005).

[23] Several of the exceptions that are well established in other jurisdictions have not been formally recognized under Connecticut law. Their development in those jurisdictions, therefore, is illuminating. See *Grovenburg* v. *Rustle Meadow Associates, LLC*, 174 Conn. App. 18, 57, 165 A.3d 193 (2017).

[24] "[T]he so-called 'therapeutic exception' "; *Arato* v. *Avedon*, 5 Cal. 4th 1172, 1190, 858 P.2d 598, 23 Cal. Rptr. 2d 131 (1993) (en banc); permits "a physician to withhold information where disclosure might jeopardize a course of therapy." *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 292; see also *Scott* v. *Bradford*, 606 P.2d 554, 558 (Okla. 1979) ("where full disclosure would be detrimental to a patient's total care and best interests

a physician may withhold such disclosure, for example, where disclosure would alarm an emotionally upset or apprehensive patient" [footnote omitted]).

[25] Some jurisdictions have enacted statutes codifying such exceptions. See, e.g., Alaska Stat. § 09.55.556 (b) (2012); Del. Code Ann. tit. 18, § 6852 (b) (1974); N.Y. Pub. Health Law § 2805-d (4) (2012); Utah Code Ann. § 78B-3-406 (3) (2012); Wis. Stat. § 448.30 (Supp. 2017); Vt. Stat. Ann. tit. 12, § 1909 (2017).

[26] Section 19-13-D3 (d) (8) provides: "Informed consent. It shall be the responsibility of each hospital to assure that the bylaws or rules and regulations of the medical staff include the requirement that, *except in emergency situations*, the responsible physician shall obtain proper informed consent as a prerequisite to any procedure or treatment for which it is appropriate and provide evidence of consent by a form signed by the patient or a written statement signed by the physician on the patient's hospital record. The extent of information to be supplied by the physician to the patient shall include the specific procedure or treatment, or both, the reasonably foreseeable risks, and reasonable alternatives for care or treatment." (Emphasis added.)

[27] Utah's informed consent statute specifically addresses the issue of patient waiver. It provides in relevant part: "It shall be a defense to any malpractice action against a health care provider based upon alleged failure to obtain informed consent if . . . the patient stated, prior to receiving the health care complained of, that he would accept the health care involved regardless of the risk; or that he did not want to be informed of the matters to which he would be entitled to be informed . . . or . . . the patient or his representative executed a written consent which sets forth the nature and purpose of the intended health care and which contains a declaration that the patient accepts the risk of substantial and serious harm, if any, in hopes of obtaining desired beneficial results of health care and which acknowledges that health care providers involved have explained his condition and the proposed health care in a satisfactory manner and that all questions asked about the health care and its attendant risks have been answered in a manner satisfactory to the patient or his representative." Utah Code Ann. § 78B-3-406 (3) (2012).

[28] Although it is undisputed that the plaintiff was provided lidocaine gel, there is no indication in the record that the defendant ever discussed the risk of labial agglutination with the plaintiff. As the defendant acknowledged in his November 4, 2016 affidavit: "I do not warn patients that their labia might be agglutinated because most do not have agglutinated labia." The plaintiff in this case does not claim that labial agglutination was a material risk that the defendant had a duty to disclose prior to performing the laser ablation procedure. See footnote 8 of this opinion.

[29] When used as a conjunction, the word "so" means "in order that" and "for that reason." See Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 1182.

[30] It is undisputed that the plaintiff cried out in pain when the defendant digitally separated her agglutinated labia. The affidavits of Andersen and the plaintiff further aver that the defendant at that time expressed his concern that the plaintiff was going to lose consciousness.

[31] We note that the defendant, in his affidavit, stated that "[i]f labia are agglutinated two weeks after laser surgery, they must be separated." While the defendant may simply have been articulating a professional medical opinion, his statement nonetheless ignores the well established right of a patient to refuse medical treatment, even when the patient's life is in jeopardy. See *Cruzan* v. *Director, Missouri Dept. of Health*, supra, 497 U.S. 278 (competent individuals have protected liberty interest under fourteenth amendment to United States constitution to refuse unwanted medical treatment); *Stamford Hospital* v. *Vega*, 236 Conn. 646, 666, 674 A.2d 821 (1996) ("[i]f the common law right to refuse medical treatment, based on the doctrine of informed consent, is entitled to respect, that respect must be accorded when the consequences are likely to be the most serious—in matters of life and death"). The plaintiff has argued, before both the trial court and now this court on appeal, that she had a right "to refuse this treatment even if it was considered necessary."

[32] We reiterate that the defendant, in his response to interrogatories, averred that he did not discover the agglutination until *after* he had finished separating the plaintiff's agglutinated labia. If that statement is credited, his explanation to the plaintiff that he digitally separated the agglutination "so that [she] would not have to go to the operating room for surgery" becomes

illogical, as a surgical option necessarily would have been impossible at that point.

---